David **GOTLIEB** and Enid **Blaymore, Plaintiffs,**

v.

**TACO BELL CORPORATION, Defendant.**

**No. CV 92–2735 (MLO).**

United States District Court, E.D. New York.

Dec. 13, 1994.

*Clark–Fitzpatrick, Inc.,* 521 N.Y.S.2d at 656–57, 516 N.E.2d at 193–94.

Salamon, Gruber, Newman, Blaymore & Rothschild, P.C. by Frederick Newman, Roslyn Heights, NY, for plaintiffs.

Friedman, Wang & Bleiberg, P.C. by Arthur S. Friedman and Susan J. Schwartz, New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

ORENSTEIN, United States Magistrate Judge:

This action involves a dispute arising from an alleged breach of a commercial ground lease, dated August 15, 1991, between the landlord plaintiffs Gotlieb and Blaymore, and tenant defendant Taco Bell Corporation ("Taco Bell").

District Judge Arthur D. Spatt granted summary judgment in favor of the plaintiffs and referred this matter to the undersigned for a trial on damages. *Order,* dated January 15, 1994. Thereafter the parties consented to proceed before a Magistrate Judge for all purposes. *Order,* November 7, 1994; 28 U.S.C. § 636(c)(1).

Plaintiffs seek damages for: 1) rent, accrued and future; 2) the value of a building that was to have been built on the premises; and 3) attorney's fees and costs. Testimony and evidence on these issues was heard at trial before the undersigned on February 14–17, 1994. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### INTRODUCTION

The parties entered into a twenty year lease, effective August 15, 1991, for the purpose of establishing a Taco Bell restaurant at 1532–54 86th Street, Brooklyn, New York. (*Lease dated August 15, 1991, attached as exhibit A to complaint,* hereinafter "Lease.") The lease provided that the defendant was required to exercise diligence to obtain the necessary permits and administrative approvals to construct and operate the Taco Bell restaurant on the premises. (*Lease* at ¶¶ 6, 69.) The defendant was entitled to cancel the lease if they were unable to obtain such permits and administrative approval within a six month "permitting period," ending on February 15, 1992. (*Lease,* at ¶ 6.)

Sometime in September, 1991, local community and religious groups began an organized effort to oppose the construction and operation of the Taco Bell restaurant at the subject location, and against fast-food establishments in the community generally. (*Affidavits of James A. Chronley, Christopher B. DeBolt and Mark W. Schaefer in opposition to Plaintiff's Motion for Summary Judgment.*)

This organized opposition included public demonstrations of protest with placards, handbilling, and letter writing, telephone campaigns, and community meetings with local politicians. (*Id.*) Taco Bell attempted to assuage this community opposition by attending these meetings, proposing amendments to the design plans and suggesting alternative measures to address the community group's safety and environmental concerns. (*Id.*)

During the intervening six month period, the Defendant engaged the services of local attorneys and engineers in an effort to develop plans and a permit application. Nevertheless, defendant did not file its permit application with the appropriate governmental entities until February 14, 1992, one day prior to the expiration of the contractual "permitting period" referred to in paragraph 6 of the lease.

Also on February 14, 1992, defendant served on plaintiffs a written repudiation of the lease pursuant to Lease paragraph 6.

Plaintiffs rejected this repudiation also by letter dated February 14, 1992. The plaintiffs initiated the instant action in June, 1992. Upon the completion of discovery, District Judge Spatt granted plaintiffs' motion for summary judgment. (*Transcript of November 26, 1993*, at 35.) District Judge Spatt found that defendant failed to meet the conditions required by lease paragraph 6, that the lease remained in effect, and that the defendant remained liable under its terms and conditions. (*Id.*)

## DISCUSSION

■■■ A lessor has numerous options when a lessee attempts to repudiate a lease prior to the expiration of its term. *See Centurion Development Ltd. v. Kenford Co., Inc.*, 60 A.D.2d 96, 400 N.Y.S.2d 263, 264 (1977); 74 N.Y.Jur.2d *Landlord and Tenant* § 108. The landlord may reject the repudiation and do nothing, in which case the tenant continues to remain liable under the terms of the lease, as there is no obligation for a commercial lessor to mitigate damages. *See Sage Realty Corp. v. Kenbee Management–New York, Inc.*, 182 A.D.2d 480, 582 N.Y.S.2d 182 (1992); *Mitchell Titus Assocs., Inc. v. Mesh Realty Corp.*, 160 A.D.2d 465, 554 N.Y.S.2d 136 (1990); *Syndicate Bldg. Corp. v. Lorber*, 128 A.D.2d 381, 512 N.Y.S.2d 674, 675 (1987) (this duty recently imposed on residential landlords, however the contrary is true in the context of commercial leases). The lessor could also elect to notify the tenant that it was entering the premises and re-letting for the tenant's benefit, in which case the tenant remains liable for any rent deficiency. *Underhill v. Collins*, 132 N.Y. 269, 30 N.E. 576 (1892). The lessor also has the option to accept the repudiation, re-enter the premises and re-let for its own benefit. In that event the lessee is generally relieved from any further liability under the lease. *See Herter v. Mullen*, 159 N.Y. 28, 53 N.E. 700, 701 (1899); *Centurion Development*, 60 A.D.2d 96, 400 N.Y.S.2d at 264; *59th & Park Assoc. v. Inselbuch*, 68 A.D.2d 838, 414 N.Y.S.2d 537, 540 (1979) (Lupiano, J. concurring); *see also* 74 N.Y.Jur.2d *Landlord & Tenant* § 108. No further rent accrues because the landlord-tenant relationship no

longer exists. *See Hermitage Co. v. Levine*, 248 N.Y. 333, 162 N.E. 97, 98 (1928).

The defendant herein repudiated the lease by letter dated February 14, 1992, (Exhibit D to Complaint), sent in response to plaintiff's letter dated February 14, 1994 (Exhibit C to Complaint). Plaintiff's letter rejected defendant's February 10, 1992 request to alter the terms of the lease (Exhibit B to Complaint). The plaintiffs' February 14, 1992 letter explicitly stated that they would reject any attempt by the defendant to repudiate the lease and informed the defendant that they would be held liable under the terms of the lease. (Exhibit C to Complaint.)

The extent of plaintiffs' entitlement to damages therefore turns upon whether the surrender and repudiation of the lease was accepted, notwithstanding the assertions made in plaintiffs' February 14, 1992 letter.

### A. Acceptance of the Repudiation

■■■ Termination of an estate by repudiation or surrender may be effected by express agreement or by operation of law, where it is inferred from the conduct of the parties. *Riverside Research Inst. v. KMGA, Inc.*, 68 N.Y.2d 689, 506 N.Y.S.2d 302, 303–04, 497 N.E.2d 669, 670–71 (1986); *Gray v. Kaufman Dairy & Ice–Cream Co.*, 162 N.Y. 388, 56 N.E. 903 (1900); *Saracena v. Preisler*, 180 A.D. 348, 167 N.Y.S. 871, 874 (1917); *Tootle Theater Co. v. Shubert Theatrical Co.*, 175 A.D. 530, 162 N.Y.S. 111 (1916); *Building Supervision Corp. v. Skolinsky*, 50 Misc.2d 375, 270 N.Y.S.2d 454, 457 (N.Y.Civ.Ct.1966); *see also Beall v. White*, 94 U.S. 382, 389, 24 L.Ed. 173 (1876).

■■■ Acceptance of a surrender is created by operation of law when the parties to a lease do some act so inconsistent with the landlord-tenant relationship which implies "their intent to deem the lease terminated." *Riverside*, 68 N.Y.2d 689, 506 N.Y.S.2d at 303, 497 N.E.2d at 670; *see also Gray*, 162 N.Y. 388, 56 N.E. at 904. Such an implied acceptance of surrender has been found in "conduct by the landlord which fell short of an actual re-letting but which indicated the landlord's intent to terminate the lease and use the premises for his own benefit." *Cen-*

*turion Development Ltd. v. Kenford Co., Inc.,* 60 A.D.2d 96, 400 N.Y.S.2d 263, 264 (1977) (citing *Saracena,* 180 A.D. 348, 167 N.Y.S. 871; *Crane v. Edwards,* 80 A.D. 333, 80 N.Y.S. 747 (1903)).

■ In addition, an outward refusal to accept repudiation of the lease does not bar a finding that the subsequent conduct of the parties creates an acceptance by operation of law. *See e.g., Gray,* 162 N.Y. 388, 56 N.E. at 904 (court found acceptance by operation of law where plaintiff refused defendant's offer of surrender yet re-rented in his own name); *Tootle Theater,* 175 A.D. 530, 162 N.Y.S. at 113 ("The fact that plaintiff refused to accept surrender . . . does not establish conclusively the absence of acceptance . . . [it may be] implied from all the circumstances of the case"). Therefore it is of no moment that the plaintiffs rejected the defendant's surrender and repudiation in February of 1992.

■ The arguments before Judge Spatt on the motion for summary judgement pertained only to whether the plaintiffs were required to accept the defendant's repudiation under the lease terms. Specifically, the issue before Judge Spatt was whether the defendant exercised due diligence in obtaining the required permits during the lease's six month "permitting period." Judge Spatt found as a matter of law, that the defendant had not met the required due diligence under the lease. Accordingly, plaintiffs were not required to accept the defendant's repudiation of the lease under paragraph 6. Thus the lease was not terminated by the defendant's February 14, 1992 letter pursuant to lease paragraph 6.

■ Nevertheless, the testimony of plaintiff David Gotlieb at the damages trial revealed that despite the plaintiffs' rejection of the defendant's repudiation and surrender, the plaintiffs negotiated and made a written offer to lease the premises for their sole benefit to a prospective new tenant, Rite–Aid drug stores. (Trial Transcript, hereinafter "Tr." at 3–142 to 3–186; Plaintiffs' Ex. 9; Defendant's Ex. F.)[1] Plaintiffs originally referred the representatives of Rite–Aid to Taco Bell for a possible sub-let (Plaintiffs'

Ex. 6.), yet apparently became impatient and initiated this effort to re-rent the property for their sole benefit. (Tr. at 3–145 to 3–146.)

On October 19, 1993, plaintiffs met directly with representatives of the Rite–Aid corporation. (Tr. at 3–144 to 3–146.) At that meeting, the plaintiffs and Rite–Aid representatives discussed renting the subject premises. (Tr. at 3–145 to 3–146.) Plaintiff Gotlieb testified that at that time he decided to deal directly with Rite–Aid, regardless of the consequences. (Tr. at 3–147.) Plaintiff Gotlieb testified:

A. After Lee [Blaymore] and I talked about it for a while, I told him I felt that I had to consider negotiating directly with Rite–Aid, let the chips fall where they may. . . . We were paying out considerable expenses month after month and going absolutely nowhere, and I felt it was time to make a decisive move.

(Tr. at 3–147.) A written proposal, dated November 3, 1993, with explicit terms of a proposed lease was then submitted to Rite–Aid representatives. (Plaintiffs' Ex. 9; Defendant's Ex. F.)

■ Mere attempts to re-let are insufficient to establish an acceptance by operation of law. *See Levitt v. Zindler,* 136 A.D. 695, 121 N.Y.S. 483 (1910); *Dorrance v. Bonesteel,* 51 A.D. 129, 64 N.Y.S. 307 (1900). However, the testimony heard by this Court indicates that the plaintiffs' acts are more than a mere attempt to re-let the premises to the general public; plaintiff Gotlieb's testimony, and the letter proposal sent to Rite–Aid representatives, unequivocally demonstrate the plaintiffs' intent to accept the defendant's surrender, re-enter the property and re-let it for their sole benefit. *See Centurion Development,* 60 A.D.2d 96, 400 N.Y.S.2d at 266. Plaintiffs' actions were inconsistent with the tenant's interest in the property, and stand in stark contrast to their argument before Judge Spatt, *also during November 1993,* asserting the lease to be in full force and effect.

The Court finds that as a result of their affirmative conduct, the plaintiffs accepted

---

**1.** Trial transcript designation includes volume number followed by page number.

the defendant's repudiation and surrender of the lease by operation of law between the October 19, 1993, meeting and the November 3, 1993 letter sent to the prospective tenant's agent. Thus the lease was terminated as of November, 1993.

■ The Court acknowledges that paragraph 62 of the lease contains a boilerplate provision which addresses acceptance of a surrender. The provision acts to shield the landlord vis-a-vis acts by the defendant such as the payment of lesser amounts of rent, or delivery of keys to the premises. Based upon the findings of this Court from the testimony presented, this provision has no effect to shield the plaintiffs from the consequences of their own affirmative conduct to re-rent the property for their sole benefit, which gives rise to an acceptance by operation of law.

### B. Rent

Plaintiffs contends they are entitled to all "base rent" both past and future, due under lease paragraph 53(A). Plaintiffs also contend they are entitled to the "additional rent," both past and future, due under lease paragraph 53(D). For the purposes of this discussion the term "rent" refers to both "base rent" and "additional rent" as defined in the lease unless otherwise indicated.

### 1. Accrued Rent

■ Defendant has never paid any rent due under the lease. Although the effective date of the lease was August 15, 1991, the defendant was to commence paying rent on June 15, 1992. (Lease ¶ 52(A)(iv); Tr. at 1–29.) The defendant repudiated the lease on February 14, 1992, and therefore never made any rent payments.

■ A lessee is obligated to pay rent even if the lessee chooses not to occupy the premises. *See Darob Holding Co. v. House of Pile Fabrics, Inc.,* 62 Misc.2d 899, 310 N.Y.S.2d 418 (Civ.Ct.1970). Based upon the finding that the plaintiffs' implied acceptance of the surrender took place as of November, 1993, and that the lease remained in effect until that time, the defendants are liable for all rent due under the lease up to November, 1993. The defendant was obligated to pay a "base rent" of $10,833.33 per month. (*Lease* at ¶¶ 53(A)(ii), 53(D).) Thus the defendant is liable for base rent for sixteen and one-half (16.5) months, in the sum of $178,749.95.

■ The defendant was also obligated to pay "additional rent" including, but not limited to, real estate taxes, late charges of one percent with accrued interest, utility services, insurance, and other fixed expenses. (*Lease* at ¶¶ 51, 53(D), 61, 66, 68, 74.) Therefore the defendant is liable for "additional rent" to November 1993, in the amount of $59,815.43, exclusive of interest.[2] (Plaintiffs' Ex. 1.)

■ One exception to plaintiffs' claim to interest is with respect to accrued base rent. (Plaintiffs' Ex. 1.) Plaintiffs' calculations include amounts for 6% interest on accrued base rent, presumably based upon Lease paragraph 61. Lease paragraph 61 allows interest at 6% for expenditures by the landlord on behalf of the tenant. Base rent is not such an expenditure.

■ In addition, plaintiffs seek $913.34 in "architectural services" as part of additional rent. (Plaintiffs' Ex. 1.) Although architect's bills have been provided as backup (Plaintiffs' Ex. 3.), the Court does not award any amounts for these services. With re-

---

2. Additional rent: derived from Plaintiffs Exhibit 1.

| | |
|---|---|
| Base rent Late charges | $10,833.33 × 16.5 × .01 = $1787.50 |
| Real Estate Taxes (prorated to 11/93) | $50,772.68 * |
| R.E. Tax Late Charges | $507.73 * |
| Property Insurance | $3,165.16 * |
| Insurance Late Charges | $31.65 * |
| Property Maintenance | $3,550.71 * |

* = Subject to interest at 6% per annum

spect to the first bill, dated April 9, 1992, the services were rendered prior to the initiation of this action. With respect to the second bill, the bill reports charges "for services; record search and review." (Plaintiffs' Ex. 3.) The plaintiffs failed to meet their burden of establishing the relevance of this service to the prosecution of the instant action or to the lease paragraph which provides for additional rent.

### 2. Future Rent

Plaintiffs seek an acceleration of all future rent due under the lease. (Complaint at ¶ 57.) This Court finds there is no entitlement to rent beyond October, 1993, because the plaintiffs accepted the defendant's repudiation and surrender of the lease. An acceptance of a surrender "operates to discharge the tenant from all liability for rent in the future." *Herter v. Mullen*, 159 N.Y. 28, 53 N.E. 700, 701 (1899) ("After the surrender, there could be no recovery of rent, since the landlord could not have the use of the premises and the stipulated rent at the same time."); *see also 59th and Park Assoc. v. Inselbuch*, 68 A.D.2d 838, 414 N.Y.S.2d 537, 540 (1979) (Lupiano, J., concurring).

Even if the plaintiffs herein merely sat idly by and allowed the defendant to remain in breach, the plaintiffs still could not maintain an action for all future rent because the lease has no acceleration clause. The only lease provision which might be considered an acceleration clause is paragraph 60(c), which provides in pertinent part:

> Tenant ... shall also pay Landlord as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the Lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease.... Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of

Landlord to collect the deficiency of any subsequent month by a similar proceeding.

This is not an acceleration clause but a provision for liquidated damages. *See e.g. Anon Realty Assoc., L.P., v. Simmons Stanley Ltd.*, 153 Misc.2d 954, 583 N.Y.S.2d 778, 780 (Sup.Ct.1992) (same lease language). In the absence of an acceleration clause no action may be brought for future rent. *Maflo Holding Corp. v. S.J. Blume, Inc.*, 308 N.Y. 570, 127 N.E.2d 558, 561 (1955) (citing *McCready v. Lindenborn*, 172 N.Y. 400, 65 N.E. 208).

What remains is an action for liquidated damages. *See International Publication Inc. v. Matchabelli*, 260 N.Y. 451, 184 N.E. 51, 52 (1933) ("What survived was a liability, not for rent, but for damages.") (citing *Hermitage Co. v. Levine*, 248 N.Y. 333, 162 N.E. 97 (1928)). However, plaintiffs have forfeited their right to all future rents as damages because plaintiffs terminated the lease. *See Centurion Development*, 60 A.D.2d 96, 400 N.Y.S.2d at 266 (finding tenant liable for rent only up to date where surrender accepted by operation of law); *Benderson v. Poss*, 142 A.D.2d 937, 530 N.Y.S.2d 362, 363 (1988) (limiting landlord's liquidated damage recovery to unpaid charges accrued up to landlord's termination of lease).

Moreover, to recover liquidated damages in the event of a breach, the amount must bear a reasonable relation to the probable loss, and the amount of actual loss must be incapable or difficult of precise estimation. *Truck Rent–A–Center v. Puritan Farms 2nd*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 368, 361 N.E.2d 1015, 1018 (1977). Here, plaintiffs are negotiating a new lease of the property at a higher rent than that contracted with the defendant. (Plaintiffs' Ex. 9). If the plaintiffs are awarded all future rents the result would be "grossly disproportionate to the probable loss." *Puritan Farms*, 41 N.Y.2d 420, 393 N.Y.S.2d at 368, 361 N.E.2d at 1018; *see also Benderson v. Poss*, 142 A.D.2d 937, 530 N.Y.S.2d 362, 363–64 (1988). In fact, a windfall would be the most likely result. Therefore, the plaintiffs are not enti-

tled to future rents under the lease as liquidated damages.

### C.  Unbuilt Structure

■ Plaintiffs also seek, as damages, the value of the unbuilt restaurant building. The defendant covenanted to construct a restaurant building on the leased premises pursuant to Lease paragraph 54. Yet the building was never built. The defendant was to have begun construction upon obtaining the required building permits. (*Lease* at ¶ 54.) As stated above, Judge Spatt found that the defendant failed to exercise the required diligence in obtaining these permits as required under Lease paragraph 6.

■ The plaintiffs are entitled to the value of the unbuilt structure. Lease paragraph 57 provides that upon termination of the lease, title to the building and any improvements will vest in the landlord.[3] The landlord's conduct, which resulted in its acceptance of the defendant's repudiation by operation of law, took place nearly one and one-half years after the initiation of this suit. Therefore, the plaintiffs are not estopped from seeking damages which had already accrued as a result of the defendant's default.

■ Both parties presented testimony of the valuation of the structure as the present value of the reversionary cost estimate of the improvement. Both side's expert found the replacement cost of the building to be approximately $320,000.00. (Plaintiffs' Ex. 5; Defendant's Ex. I.) However, the parties diverged as to the calculation of the present value of the replacement cost. (Plaintiffs' Ex. 5; Defendant's Ex. I.) The Court was troubled by both experts' valuations. Defendant utilized a discount rate of 12 percent and an additional reduction for the structure's obsolescence at the end of the lease period. (Defendant's Ex. I.) Plaintiffs employed a low rate of depreciation combined with a high rate of inflation. (Plaintiffs' Ex. 5.)

Nevertheless, defendant's expert never visited the subject premises or neighborhood, and based his conclusions solely upon abstract calculations. (Tr. at 2–222 to 2–223.) Thus no weight was accorded to defendant's reduction for the structure's obsolescence at the end of the lease period. (Tr. at 2–220.) The Court concludes that the plaintiffs' expert's report and testimony more convincingly supports plaintiffs' estimate of the present value of the structure's replacement cost. Plaintiffs' valuation appears to be the more realistic. Therefore, the defendant is liable for the present value of the replacement cost of the unbuilt structure in the amount of $73,000.00.

### D.  Attorney's Fees and Costs

■ Plaintiffs also seek to recover attorney's fees incurred in this action. Lease paragraphs 35 and 63 provide for recovery of attorney's fees for the prevailing party in an action to enforce any provisions of this lease. The Court notes that paragraph 35 provides for "costs" and paragraph 63 does not. Nevertheless, the failure of paragraph 63 to refer to costs does not supersede the costs provision of paragraph 35.

■ Defendant argues that the plaintiffs are not a "prevailing party" entitled to attorney's fees because this action has resulted in a "mixed outcome." *Schwartz Letter,* dated March 2, 1994. Defendant alternatively argues that the costs should be apportioned as to issues upon which the party prevailed. *Id.*

The Court finds that the plaintiffs are "prevailing parties" as provided under the lease provisions. The Supreme Court has defined a "prevailing party" as one who succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). Although the plaintiffs have not proven all of the damages they seek, plaintiffs were granted summary judgement as to liability on each of the causes of

---

**3.** The Court notes that Lease paragraph 37 provides that at the landlord's election, the tenant must surrender the property in a clean and bare condition, or with any improvements then existing upon the property. This provision assumes that defendant has complied with their obligation to build the building. Paragraph 37 therefore has no application to this analysis.

action. Therefore, the plaintiffs are entitled to attorney's fees under the lease provisions.

■ Moreover, the lease provides for attorney's fees in enforcing any lease provision. (*Lease,* ¶¶ 35, 63.) Here the defendant was in default of its rent obligation during a period that Judge Spatt found the lease was still in effect. The plaintiffs prevailed in recouping damages with respect to this period of time because the Court has found that the plaintiffs are entitled to all accrued rent while the lease was in effect.

■ Lease covenants providing for attorney's fees and costs for an action under a lease are valid and not contrary to public policy as long as they are reasonable and not intended as a penalty or forfeiture. *379 Madison Ave. v. Stuyvesant Co.,* 242 A.D. 567, 275 N.Y.S. 953, 956 (1934), *aff'd,* 268 N.Y. 576, 198 N.E. 412 (1935); *see also, Livigne v. D'Agostino Supermarkets, Inc.,* 616 N.Y.S.2d 515, 516 (App.Div.1994) (mem.); *Trump Village Sec. 3, Inc. v. Moore,* 84 A.D.2d 812, 444 N.Y.S.2d 134, 135 (1981) (citing *Equitable Lbr. Corp. v. IPA Land Development Corp.,* 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391 (1976)).

■ In determining the amount of an award of attorney's fees in landlord-tenant cases, New York courts have utilized the "lodestar" method. *See e.g. Zauderer v. Barcellona,* 130 Misc.2d 234, 495 N.Y.S.2d 881, 882 (Civ.Ct.1985); *Sommer v. Hyman,* 122 Misc.2d 399, 471 N.Y.S.2d 501, 504 (Civ.Ct. 1984). The amount of the fee award is initially estimated by multiplying the number of hours reasonably expended on the litigation, as determined by the Court, by the reasonable hourly rate. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986).

■ The relevant factors in determining the reasonable value of legal services are the complexity of the case, experience of counsel, the skill exercised in handling the case, and the results achieved. *See Jordan v. Freeman,* 40 A.D.2d 656, 336 N.Y.S.2d 671 (1972); *Newman v. Silver,* 553 F.Supp. 485 (S.D.N.Y. 1982).

■ Counsel for the plaintiffs seek $101,-722.86 in attorney's fees and disbursements, not including accrued interest provided for under lease paragraph 61.[4] (Plaintiffs' Ex. 1.) This figure was obtained by billing of attorneys' time at $150.00 per hour, and in the case of one particular partner's time was billed alternatively at $150.00, $250.00, and $275.00 per hour. (Plaintiffs' Ex. 2.) The defendant does not challenge the reasonableness of this rate and the Court, too, finds this reasonable.

■ However, the amount sought for legal services alone is $92,945.00, comprising 593.25 hours of billed time up to the damages trial. (Plaintiffs Ex. 2.) The Court does not find this a reasonable amount of time. This determination is made "on the basis of [the Court's] own assessment of what is appropriate for the scope and complexity of the particular litigation." *New York State Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983); *see also F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987) (burden is on counsel to keep and present records from which the court may determine the nature of the work done, the necessity, and the amount of time reasonably required); *Seigal v. Merrick,* 619 F.2d 160, 164 & n. 9 (2d Cir.1980) (court may make appropriate reductions in fee for duplicative staffing or billing); *DeVito v. Hempstead China Shop, Inc.,* 831 F.Supp. 1037, 1045 (E.D.N.Y.1993), *rev'd on other grounds,* 38 F.3d 651 (2d Cir.1994).

The Court has deciphered vague and cryptic billing entries presented as Plaintiffs' Exhibit 2. Exhibit 2 revealed multiple instanc-

---

**4.** The Court notes that the requested figure of $101,772.86 reflected in Plaintiffs' Exhibit 1 is based upon the amounts paid by the client up to the preparation of Plaintiffs' Exhibit 2, not based upon the actual time and expense records which comprise Plaintiffs' Exhibit 2. A thorough analysis of Plaintiffs' Exhibit 2 reveals the total amount to be $104,884.27. The differential appears to be the result of the familial relationship between plaintiffs and one of the firm's partners, where some time was written-off or not paid by the client at the time Plaintiffs' Exhibit 2 was prepared. In determining a reasonable fee, the Court utilized the actual time records of work done rather than what was selectively charged to, or paid by, the client.

es of duplication and unreasonable amounts of time expended on certain efforts.[5] For example, entry # 5360 of the August 3, 1992 bill revealed that 2.25 hours were spent discussing scheduling of depositions with the client. In another example, the October 1992 bill reveals that one attorney expended over twelve hours (12) to prepare for an eight (8) hour deposition (entries # 2794 and # 2786). The April 1993 bill also reveals that the same attorney expended combined 16.67 hours (entries # 3688, # 3754, # 3726, and # 3860) to prepare for a seven (7) hour deposition (entry # 3991).[6] A further example of duplication of effort and unreasonable amounts of time involved the drafting of a reply letter to the defendant's August 17, 1992 letter; one entry (# 2436 in the October 10, 1992 bill) provided for 2.17 hours to draft a reply letter, yet another entry (# 2666 of the same bill) provides for another .67 hours of time for the same task. In these and many other entries which the Court deemed duplicative or unreasonable, the time billed was deducted or reduced. In addition, time billed for settlement discussions was disallowed. *See e.g. Banca Della Svizzera Italiana v. Cohen,* 756 F.Supp. 805, 809 (S.D.N.Y.1991).

Based upon a thorough review of plaintiffs' exhibit 2, the Court finds that plaintiffs are not entitled to $23,566.25 of the legal services billed. The resulting reasonable fee for plaintiffs' counsel's time up to the damages trial is $69,378.75. In addition, the Court notes that the bill for plaintiffs' trial counsel's presentation at the damages trial was not submitted; the Court fixes a fee of $7,000.00 based upon the parties' agreement that $250.00 per hour is reasonable for his time.[7] Thus the defendant is liable for plaintiffs' attorney's fee in the amount of $76,378.75.

■■■ As to the plaintiffs' attorney's costs and disbursements, Plaintiffs' exhibit 2 contains entries for a total of $11,939.27. However, no actual bills, records or docu-

mentation have been included. Although Rule 11 of the Civil Rules of the Eastern District of New York allows taxation of certain costs and disbursements, the rule requires "[b]ills and cancelled checks in payment *shall* be attached as exhibits (emphasis added)." *Rule 11(a) of the Civil Rules of the Eastern District of New York.* Therefore, the Court declines to award costs for such unsupported entries as "Parking," "Travel," "Fax," "Westlaw," "Federal Express," "messenger," and many other such entries in Plaintiffs' Exhibit 2. *See e.g. Devito,* 831 F.Supp. at 1045–46. However, the Court will award costs and disbursements to plaintiffs' counsel for allowable expenses upon presentation of appropriate documentation, and proof of payment to the Clerk of the Court upon settlement of judgment. *See Rule 11(c) of the Civil Rules of the Eastern District of New York.*

### CONCLUSION

For the reasons set forth above, the plaintiffs are entitled to judgment in favor of the plaintiffs in the sum of $387,944.13, as follows: 1) the sum of $178,749.95 in past due base rent; 2) the sum of $59,815.43 in past due additional rent, with interest; 3) the sum of $73,000.00 for the value of the contracted-for structure, with interest from November, 1993; 4) attorneys' fees in the amount of $76,378.75 with interest from February, 1994; and 5) costs and disbursements upon proper supporting proof.

SETTLE JUDGMENT ON NOTICE.

---

**5.** The Court has accounted for entries by one particular attorney ("MDB") which were carried over to later months and not charged to, or paid for, by the client, although reflected on that month's billing records.

**6.** However, the April 1993 bill was thereafter reduced by an amount equivalent to eight hours

of that attorney's time, although the bill did not indicate where that time was taken from. (*See* Plaintiffs' Ex. 2, handwritten notation on April, 1993 bill.)

**7.** This amount is comprised of: $250.00 per hour × 7 hours per day × 4 days = $7,000.00.