**In re ANDOVER TOGS, INC., et al., Reorganized Debtors.**

**Bankruptcy Nos. 96 B 41437(TLB) to 96 B 41440(TLB).**

United States Bankruptcy Court, S.D. New York.

March 12, 1999.

Whitman Breed Abbott & Morgan L.L.P., New York City, by Norman N. Kinel, for the Reorganized Debtors.

Wien & Malkin L.L.P., New York City, by Robert C. Buff, for Mid–City Associates.

Chadbourne & Parke L.L.P., New York City, by N. Theodore Zink, Jr., for Special Counsel to Mid–City Associates.

## OPINION DENYING IN PART AND GRANTING IN PART THE DEBTOR'S OBJECTIONS TO THE REJECTION, GENERAL UNSECURED AND ADMINISTRATIVE CLAIMS OF MID–CITY ASSOCIATES

TINA L. BROZMAN, Chief Judge.

### Introduction

During the course of its successful chapter 11 proceedings, Andover Togs, Inc. ("Andover"), a garment manufacturer, attempted to negotiate with Mid–City Associates ("Mid–City"), its landlord, more favorable terms which would have allowed the debtor to remain at the premises which it had occupied as its executive offices for almost twenty years. Failing to achieve agreement, Andover rejected the lease. When Andover vacated the space to move to more modest headquarters, Mid–City, with an eye towards its perception of what the open market preferred, promptly demolished Andover's im-

provements. Some time later, Mid–City re-let a portion of the space—at a price per square foot higher than what Andover was paying—but only after Mid–City had offered a variety of concessions to its new tenant and paid for substantial construction. Mid–City subsequently filed against Andover claims for damages sustained from the lease's rejection as well as an administrative claim. Andover objected to the various claims on a number of different theories including that the gutting of the space contributed in substantial part to the landlord's damages and that the higher rent per foot precluded any finding of damage to Mid–City. Unfortunately, the unsuccessful outcome of the parties' negotiations seems to have permeated all aspects of their relationship, culminating not only in Andover's objection to the claims filed by Mid–City, but in a request that Mid–City be sanctioned for its trial conduct.

By way of damages from the rejection of the lease under section 365 of the Bankruptcy Code, Mid–City seeks $1,356,670 (the "rejection claim"). The administrative claim, which arises out of 9 days' rent which Andover incurred as a holdover tenant until it vacated the premises, asks from Andover $35,811.31 (the "administrative claim"). Mid–City also asserts a general, unsecured claim in the amount of $195,803.95 for prepetition rent arrears and charges for air conditioning, cleaning and other services provided by Mid–City (the "unsecured claim"). Andover does not dispute $137,426.23 of the $195,803.95 unsecured claim and $28,650.68 of the $35,811.31 administrative claim. However, Andover requests that I disallow these admittedly valid claims as a sanction for Mid–City's denial that there existed any management agreement regarding the building housing Andover's former headquarters, a denial which Mid–City steadfastly maintained until one of Mid–City's own employees conceded the agreement's existence during trial, not long after which Mid–City produced it. For the reasons set forth below, Andover's motion regarding the unsecured and rejection claims is denied in part and granted in part, and its motion regarding the administrative claim is denied.

## I.

On March 19, 1996, Andover and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Andover, which is primarily engaged in the design, manufacture, import and sale of popular-priced children's active wear, had streamlined many of its operations and overhead as part of its bankruptcy case. On April 10, 1997, I confirmed their First Amended Plan of Reorganization, which provided for a 100 percent payout, including interest, to all creditors.

Back in August, 1994, Andover had executed a non-residential real property lease with Mid–City, which was subsequently modified three times in 1995 (the "Lease"). The Lease covered the entire 46th floor and approximately 1,390 square feet on the 6th floor in the building in Manhattan known as One Penn Plaza. Andover used the space on the 46th floor for its executive offices as well as for its production, showroom, computer, designer and sewing sample operations, and the 6th floor space for storage. (Tr. 6/2/97 at 528–529). The 46th floor is a tower floor comprising 33,287 square feet with expansive views of the city spanning the East and Hudson Rivers. (Tr. 5/14/97 at 137–138). The Lease, which expires on April 30, 2004, requires Andover to make the following annual base rent payments, payable in monthly installments:

$765,601 through February 28, 1997;

$832,175 for the period of March 1, 1997 through February 28, 2000;

$898,749 for the period of March 1, 2000 through February 28, 2002; and

$932,036 for the period from March 1, 2002 through April 30, 2004.

(Trial Exhibit 1). With the inclusion of the 6th floor space, the annual rent increased by $21,570. The base rent set forth in the Lease does not include charges for electricity, real estate tax escalations or operating expense escalations, although these items appear in the Lease as additional charges which Andover is obligated to pay. (Trial Exhibit 1).

As part of the streamlining of its operations and overhead during the bankruptcy

case, Andover sought to reduce its rent and the amount of space it was occupying. Because Andover had been a tenant at One Penn Plaza for nearly 20 years, it had approached Mid–City to further modify the Lease. (Tr. 5/14/97 at 124–125). When negotiations failed, Andover rejected the Lease (Tr. 5/14/97 at 125–126), effective as of August 31, 1996 (the "Rejection Date"), but vacating the premises on September 9, 1996. As of the Rejection Date, approximately 7¾ years of the Lease term remained.

## II.

### A. The Rejection Claim

Although the primary issue centers on the proper calculation of Mid–City's rejection claim under section 502(b)(6) of the Bankruptcy Code, there are subsidiary issues, such as whether certain spaces were effectively deleted from the Lease by Andover, whether various charges set forth in the Lease may be included in Mid–City's calculation of its rejection claim, and whether Mid–City's gutting of the 46th floor space delayed its reletting of the premises, prevented Mid–City from mitigating its damages and inflated the cost of Mid–City's tenant improvements (included as part of its rejection claim). We begin with those lesser issues.

#### 1. The Purported Deletion of Space

Article 49 of the Lease and Section 5(c) of the Second Lease Modification Agreement provide that Andover may exercise options to delete nearly 6,900 square feet, or approximately 20 percent, of the 46th floor space and the entire 6th floor space from the Lease upon proper and timely written notification, if and so long as Andover is not in default under the Lease beyond any grace period. (Trial Exhibits 1 and 3).

■ Andover contends that the rejection claim is overstated because it includes $24,724.61 in damages for the 6th floor space which Andover asserts was deleted from the Lease on proper notice to Mid–City. Section 5(c) of the Second Lease Modification Agreement provides that Andover may delete the 6th floor space from the premises upon 90 days' written notice to Mid–City. William Cohen, Chairman and President of Andover,

testified that Andover provided actual notice to Mid–City that Andover intended to delete the 6th floor storage space by virtue of having filed its lease rejection motion and providing a copy of it to Mid–City in August, 1996, the same time that Andover notified Mid–City that Andover was going to reject the Lease and vacate the premises (Tr. 5/14/97 at 122–123). No other written notice was provided. (Tr. 5/14/97 at 123).

Article 26 of the Lease details the type and manner of service of any notice required to be given under the Lease, or by any law or governmental regulations. Specifically, Article 26 provides that Mid–City will be deemed to have been served once Andover sends the required notice by registered or certified mail. Because the lease rejection motion was filed less than one month prior to the effective rejection date of August 31, 1996, Andover did not provide Mid–City with the requisite 90 days' notice required to exercise the option, assuming, but not deciding, that Andover did not need to comply with the requirement for registered or certified mail. In any event, had Andover given good notice, the space would not have been deleted from the Lease until sometime in November, 1996, more than 2 months after rejection of the Lease. Thus, the 6th floor space was still part of the Lease at the time it was rejected.

■ Andover also contends that the rejection claim is overstated because it includes $207,612.37 in damages for that portion of the 46th floor space which Andover asserts was effectively deleted. The Lease provides that Andover may exercise its option to delete this space if the following conditions are met: (i) at least six months' written notice of Andover's exercise of this option must be given to Mid–City (Lease, Article 49); (ii) the notice must be provided by registered or certified mail and addressed to Mid–City at 60 East 42nd Street, New York, New York, or to such other address as Mid–City may designate (Lease, Article 26); and (iii) Andover is not in default under the Lease beyond any grace period (Lease, Article 49). Andover contends that it complied with these conditions by sending a certified letter dated February 26, 1996 (the "February 26th Let-

ter") to Mid–City, six months prior to the date of rejection of the Lease, in which it advised Mid–City of Andover's election to exercise its option to relinquish and delete this portion of the 46th floor, and by hand-delivering a copy to Daniel E. North, Vice President of Helmsley–Spear, Inc. ("Helmsley–Spear"), the managing and leasing agent employed by Mid–City for One Penn Plaza. (Tr. 5/14/97 at 117–118, 153). Mr. Cohen testified that he also informed Mr. North in the fall of 1995 of Andover's need to reduce its space based upon a reduction in Andover's operations. (Tr. 5/14/97 at 114).

It is hornbook law that a lease is a contract containing provisions or clauses for the protection of both parties and terminates upon a definite date agreed upon by the parties. 74 N.Y.Jur.2d *Landlord and Tenant* § 3 (1988). It frequently contains "provisions giving the parties, or one of them, the election, privilege or option to terminate the lease either at will or on the happening of some contingency, such as the destruction of the premises, or the decision of the landlord to sell, alter or improve the premises." 74 N.Y.Jur.2d *Landlord and Tenant* § 763 (1988). These options granted by the provisions of a lease contract will be strictly construed where they are exercised in good faith. *Id.; In re Royal Yarn Dyeing Corp.*, 114 B.R. 852, 856 (Bankr.E.D.N.Y.1990). Similarly, the notice provisions of a lease are to be strictly construed, especially where such substantive rights, i.e. possession of all or part of the premises, is in question. *D.A.D. Restaurant, Ltd. v. Anthony Operating Corp.*, 139 A.D.2d 485, 526 N.Y.S.2d 590, 591 (1988), *appeal denied*, 72 N.Y.2d 806, 529 N.E.2d 177, 532 N.Y.S.2d 847 (1988).

Whereas the letter was addressed to Mid–City, it was sent to Helmsley–Spear at One Penn Plaza rather than to Mid–City at 60 East 42nd Street, as the Lease required. (Andover's Motion For An Order Disallowing and Expunging Claim 303, Exhibit D). It is undisputed that Mid–City eventually received the February 26th Letter, in which Andover advised Mid–City of Andover's intent to delete a portion of the 46th floor from the Lease, for Mary Gartland, Controller for Mid–City, testified that she discovered Andover's certified letter by "sheer accident" in the file of another tenant on the eve of the trial. (Tr. 3/19/97 at 75–76,154–155). The original letter was produced by Mid–City on March 19, 1997 after Ms. Gartland retrieved the letter from Mid–City's own files. (Tr. 3/19/97 at 154). However, Mid–City argues that because the February 26th Letter was sent by certified or registered mail to Helmsley–Spear, instead of in accordance with the terms of the Lease, Andover failed to provide proper notice of its intent to exercise the option.

Mid–City further contends that Andover could not have exercised its option to delete the 46th floor space because it was in default on its rent. Under New York law, when a lease provides that a tenant is obligated to make a rent payment on a specified day, the tenant is in default under the lease if the rent payment is not made by the end of that day. *Henninger v. Clay*, 4 Misc.2d 795, 162 N.Y.S.2d 230 (2d Dept.1956). No demand by a landlord is necessary in order for the tenant to be in default if the tenant does not make the required rent payment, unless otherwise specifically provided in the lease. *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979).

Andover claims that its default may be disregarded because Mid–City never served Andover with any notice of default as required by the Lease.[1] Because Mid–City did not do so, Andover continues, Mid–City acted in bad faith, depriving Andover of an opportunity to cure. Putting aside, for the moment, whether Mid–City had any obligation

---

1. Article 14 provides, "If Tenant defaults in fulfilling any of the covenants of this Lease, including the payment of rent or additional rent, or if the demised premises become vacant or deserted, then, in any one or more of such events, upon Landlord serving written 15 days' notice upon Tenant specifying the nature of said default and upon the expiration of said 15 days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of such a nature that the same cannot be completely cured or remedied ... then Landlord may serve a written 5 days' notice of cancellation of this Lease upon Tenant, and, upon the expiration of said 5 days, this Lease and the term ... shall end and expire."

to serve notice of default, the evidence demonstrates that Andover was well aware of its rental default, such that Mid–City's failure to notify Andover of a default did not deprive Andover of anything. Stephen Golding, Assistant Comptroller of Mid–City, testified that, according to Mid–City's rent bills to Andover, the last payment made by Andover to Mid–City was on February 1, 1996, several weeks prior to the filing of Andover's bankruptcy petition (Tr. 5/14/97 at 98–99), and that after this payment, Andover still owed $78,815.32 in rent. (Tr. 5/14/97 at 99). Mr. Cohen testified on cross-examination that he knew in March 1996 that Andover owed almost $200,000 in past rent but that he had no knowledge one month earlier that Andover owed any rent to Mid–City (Tr. 5/14/97 at 164–165). I do not find persuasive Mr. Cohen's testimony that he did not know that Andover was not current in its rent obligations on February 26, 1996, especially since less than one month after Andover sent the February 26th Letter, Andover filed its bankruptcy schedules listing Helmsley–Spear as its second largest creditor, having an undisputed, liquidated and non-contingent claim in the amount of $196,365.37 for unpaid rent, an amount well in excess of one month's rent. (Tr. 5/14/97 at 160; Trial Exhibit 13).

Returning to the issue which we temporarily put aside, that is, whether Mid–City had an obligation to notify Andover of its default, Andover called an expert witness by the name of Harold S. Grace, Jr., Ph.D., who testified that it was "his feeling" that a landlord has an obligation to notify a tenant very quickly if it believes that the tenant does not have the right to exercise an option. (Tr. 6/2/97 at 406–407). Nowhere does the Lease here impose such an obligation; rather, Andover reads such an obligation into the Lease through the doctrines of equitable estoppel and laches. Andover contends that, having failed to notify Andover—until it objected to Mid–City's claim a little less than a year later—that it disputed Andover's purported exercise of the option in February 1996, Mid–City is barred from contesting the deletion of the space now.

Plainly, Mr. Grace's testimony notwithstanding, the terms of the Lease do not require Mid–City to serve a notice of default for Andover to be precluded from exercising its option to delete space. Rather, Mid–City is required under Article 14 of the Lease to provide Andover with notice of its default for nonpayment of rent, thereby giving Andover a 15–day grace period before Mid–City may exercise its right to terminate the Lease. The Lease does not provide for any grace period relating to Andover's exercise of its option. Because the Lease requirement that Andover not be in default at the time of the exercise of the options was a condition precedent to its right to utilize the space deletion options, Andover's default in making its rent payments when due, unless engendered by Mid–City's actions, rendered Andover's Lease options void. *See In re Eastern Systems, Inc.*, 105 B.R. 219 (Bankr.S.D.N.Y. 1989), *aff'd*, 89 Civ. 7934(MJL), 1991 WL 90733 (S.D.N.Y. May 23, 1991). Similarly, unless Mid–City can be said to have acted in bad faith, a proposition which Andover advances, Andover's failure to give proper notice of exercise of the option precluded it from exercising the option to delete space. So it is to equitable estoppel and then to laches that we turn.

Under New York law, the essential elements of equitable estoppel relating to the party to be estopped are: "(1) conduct which amounts to false representation or concealment of material facts or which gives the impression that the facts are otherwise than asserted, (2) an intention or expectation that such conduct would be relied upon by the other party, and (3) actual or constructive knowledge of the real facts. The elements relating to the party asserting the estoppel defense are (4) lack of knowledge of the real facts, (5) reliance on the conduct of the party to be estopped, and (6) action based thereon resulting in a prejudicial change of position." *Eastern Systems*, 105 B.R. at 234 (citations omitted). In addition, in order for a court to invoke the estoppel principle against a landlord, the party claiming injury must show that it acted in good faith. *Id.* at 235 (citation omitted). Andover has failed to meet its burden of proof under the theory of equitable estoppel. First, there was no conduct by Mid–City which amounted to a false repre-

sentation or concealment of a material fact regarding the rental payments. To the contrary, the evidence demonstrates that Mid–City had notified Andover of its rent arrearages prior to Andover's attempt to exercise the options. (Trial Exhibits 9 and 10). Thus, Andover had actual or, at the very least, constructive knowledge of its rent arrearages. Moreover, Mid–City provided notice of Andover's default prior to Andover's attempt to exercise the options by providing Andover with copies of the monthly rent billings which indicated Andover's increasing rent arrearages. Because Andover had actual or constructive knowledge of its rent arrearages imparted to it by Mid–City, Andover could not rightfully rely upon Mid–City's failure to quickly advise Andover that the options could not be exercised to conclude that Mid–City would overlook the rent arrearages and allow exercise of the option. *See Eastern Systems,* 1991 WL 90733, at *7.

■ Andover further contends that Mid–City should be estopped from arguing that Andover's deletion notices were invalid under the doctrine of laches. That doctrine is available when a right is not asserted for an unreasonable and unexplained amount of time, which delay causes prejudice to an adverse party and renders it inequitable to permit the exercise of that right. *Airco Alloys Div. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (1980). Laches is no more availing to Andover than was equitable estoppel. First, Andover provided its purported notice of its intent to exercise its option to delete the 6th floor space only 3 weeks, instead of 90 days, before the Lease was rejected. Second, there is no evidence that Mid–City's silence regarding the February 26th Letter until Andover objected to its lease rejection claim prejudiced Andover in any way, for Mr. Cohen testified that Andover determined within one month of the chapter 11 filing that if Mid–City were unwilling to reduce the rent and the space demised under the Lease that Andover would have no other alternative but to reject it. (Tr. 5/14/97 at 125–126). Be-

cause Andover says it believed that it had reduced the amount of space prepetition through exercise of the options, its decision to reject must have been predicated on its inability to further reduce the space rather than on the deletion or failure to delete the 46th floor space through the option mechanism. Accordingly, Mid–City properly includes damages in connection with Andover's rejection of both spaces in its rejection claim [2].

### 2. Whether Mid–City Sustained Compensable Damages

#### a. The Proper Standard

Andover argues that the rejection claim should be expunged because Mid–City did not sustain actual damages. Andover's argument is bottomed on the theory that the fair market rental value of the premises exceeded the remaining rent reserved under the Lease. Mid–City replies that it has sustained actual damages due to the breach of the Lease well and above its damages under the section 502(b)(6) cap. Relying on *In re D. H. Overmyer Co. v. Irving Trust Co.,* 60 B.R. 391 (S.D.N.Y.1986), Andover responds that because Mid–City failed to overcome the presumption that the fair market rental value of the premises is at least equal to, if not greater than, the rent reserved under the Lease, its lease rejection claim should be expunged.

In *Overmyer,* the landlord filed a claim for damages following the debtor's rejection of its lease. The debtor objected to the landlord's claim, arguing that the landlord did not sustain any actual damages. The *Overmyer* court computed the landlord's damages by applying both the standard enunciated by the Supreme Court in *City Bank Farmers Trust Co. v. Irving Trust Co.,* 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937) and the damage clause in the lease which calculated damages in a bankruptcy context. In so doing, the court acknowledged that because the formulae were similar in nature, it did not need to decide whether the computation of damages provided for in the lease or in the *dictum* by

---

**2.** To the extent that Andover continued to occupy space on the 6th and 46th floors after it rejected

the Lease, the same result obtains.

the Supreme Court in *Farmers Trust* should control determination of a landlord's actual damages. *Overmyer*, 60 B.R. at 396. In *In re W.T. Grant Co.*, 36 B.R. 939, 941 (S.D.N.Y. 1984), a case involving an objection by a trustee to a landlord's proof of claim, the court explained that

"... the [Bankruptcy] Act itself does not provide a formula ascertaining the appropriate measure of damages (citations omitted). Therefore, absent a specific damage provision in a lease, courts apply the rule enunciated by the Supreme Court in *City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937), *i.e.*, that the measure of damages which the landlord may recover as a result of the tenant's breach is 'the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth.' *Id.* at 433, 57 S.Ct. at 297; (citations omitted). Thus, the landlord may recover only actual damages suffered as a result of the tenant's breach. (citations omitted)."

*See also In re J. Bildner & Sons, Inc.*, 106 B.R. 8, 13 (Bankr.D.Mass.1989); *In re Child World, Inc.*, 161 B.R. 349, 352 (Bankr. S.D.N.Y.1993) ("Absent any specific provision in a lease, the general rule is that the measure of damages which a landlord may recover as a result of a tenant's rejection of the lease is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth."). *Cf. In re Ames Department Stores, Inc.*, 209 B.R. 627 (S.D.N.Y.1997). *See also In re Highland Superstores, Inc.*, 154 F.3d 573, 578 (6th Cir.1998) (although not deciding whether the formula approved in *dicta* in the *Kuehner* and *Farmers Trust* cases is necessarily the correct, or the only appropriate method for computing a lessor's rejection damage claim, the court stated that "we find nothing in [these cases] suggestive of the Supreme Court's intent to adopt a uniform federal rule governing computation of a lessor's rejection damages without regard to state law."); *In re Financial News Network, Inc.*, 149 B.R. 348, 352 (Bankr.D.N.Y.1993) ("[T]he amount of the [rejection] claim is to be determined by the court in accordance

with the state law and the contract between the parties.")

Turning to Andover's Lease, we pause to look at the arguably relevant provisions. Not surprisingly, Andover and Mid–City differ as to which clause provides the proper methodology for computing Mid–City's actual damages. Andover argues that Section 13.04 applies whereas Mid–City contends that Section 15.01 governs. Section 13.04 provides that in the event the Lease is terminated in any of the bankruptcy contexts set forth in Sections 13.01, 13.02 and 13.03 therein, Mid–City shall be entitled to recover from Andover as and for liquidated damages:

"an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the then fair and reasonable rental value of the demised premises for the same period, if lower than the rent reserved at the time of termination."

Section 15.01 of the Lease specifies the amount of damages to be paid to Mid–City "in case of re-entry, expiration and/or dispossess by summary proceedings or otherwise as set forth in Article 14 hereof." As mentioned earlier, Article 14 of the Lease describes the types of default which could lead to termination of the Lease and Andover's and Mid–City's obligations and rights in connection therewith. Section 15.01(c) computes the amount of damages to be paid for Andover's failure to observe and perform its covenants contained in the Lease as the

"deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. The failure or refusal of Landlord to re-let the premises or any part of parts thereof shall not release or affect Tenant's liability for damages. In computing such damages there shall be added to the said deficiency such expenses as landlord may incur in connection with re-letting, such as legal expenses, reasonable attorneys' fees, brokerage and for keeping the demised prem-

ises in good order or for preparing the same for re-letting."

Mid–City argues that because Andover voluntarily commenced its chapter 11 proceeding, none of the bankruptcy situations described in Sections 13.01, 13.02 and 13.03 of the Lease, that is, the occurrence of Andover's bankruptcy prior to the commencement of the term of the Lease, the service of a notice by Mid–City terminating the Lease because of Andover's bankruptcy, and the commencement of an involuntary bankruptcy proceeding against Andover which was not vacated or stayed by Andover within a certain time period, occurred, thereby precluding the application of the liquidated damages formula set forth in Section 13.04. Mid–City elevates form over substance. It is evident from Section 13.02 that the parties intended to apply the liquidated damage computation found in Section 13.04 in the event Andover was involved in one of the types of bankruptcy situations described therein, including Andover's filing of a voluntary petition in bankruptcy during the term of the Lease.[3] In addition, it is irrelevant that Mid–City did not serve a notice upon Andover terminating the Lease because Mid–City is automatically stayed from so doing pursuant to section 362 of the Bankruptcy Code. Therefore, I find, as did the *Overmyer* court with respect to a similar damage clause contained in the lease before it, that Article 13, designated in the Lease as "Bankruptcy," is the proper liquidated damage provision to be applied in this case.

Because the measure of damages found in Section 13.04 of the Lease is similar to the standard enunciated in *Farmers Trust*, I may apply either to determine whether Mid–City sustained actual damages from Andover's rejection. The parties offered differing evidence regarding the fair market rent for Andover's space after rejection of the Lease and significantly disagreed as to how to compare the remaining rent reserved under the Lease against the fair market value of the premises, particularly with respect to: (i) how long it would take for Mid–City to relet the premises and start to receive an income stream from the new tenant; (ii) the appropriate amount per square foot to utilize in computing the cost of new tenant improvements; and (iii) whether the Electricity Rent Inclusion Factor ("ERIF") charges may be included in determining the future rental stream that Mid–City would have received from Andover.

Sharon Locatell, an expert witness for Mid–City and the managing director of the commercial division of Brown Harris Stevens Appraisal & Consulting (Tr. 5/14/97 at 10), testified that, based upon Mid–City's lease with P.S.I., Inc., dated July 28, 1997, for approximately half of the 46th floor (Tr. 9/11/97 at 707, 709), the current fair market value of the Lease is $30 per square foot. (Tr. 9/11/97 at 757). The P.S.I. lease provides for a base rent payment of $30 a square foot for approximately the first 4½ years, and then steps up to $32 per square foot for the next two years, and for the remaining term moves to $34 per square foot. (Tr. 9/11/97 at 709). She also testified that on September 1, 1996, the market rate for the 46th floor was $29 per square foot. (Tr. 9/11/97 at 757), whereas the face rent Andover was paying under the Lease was $26 per square foot. (Tr. 3/19/97 at 69). Stephen Marotta, project manager with Zolfo Cooper, L.L.C., Andover's court-approved financial advisors, testified that Mr. North informed him that Andover was paying $25 a square foot under the Lease. (Tr. 6/2/97 at 359).

Ms. Locatell further testified that the methodology ordinarily used to determine net fair market value rent is to deduct from the average gross rent, which is the average per square foot rent over the term of the lease, the landlord's capital costs and the concessions that the landlord must offer a tenant to obtain rent. (Tr. 5/14/97 at 24–26). She included in the capital costs the con-

---

**3.** Section 13.02 provides in relevant part:
Subject to then applicable law and to the provisions of Section 13.03, if at the date fixed as the commencement of the term of this Lease or if at any time during the term hereby demised there shall be filed by ... Tenant in any court pursuant to any statute ... of the United States ... a petition in bankruptcy or insolvency or reorganization ..., Landlord may at Landlord's option, serve upon Tenant ... a notice in writing stating that this Lease and the term hereby granted shall cease....

struction of a common corridor on a multi-tenant floor. (Tr. 9/11/97 at 710). Those costs to the landlord also include, she said, its contribution to the tenant's initial installation, the brokerage commission incurred to obtain the lease, "downtime" and free rent. (Tr. 5/14/97 at 34–35, 38–39)[4]. Mr. North testified that in 90 percent of the cases where he leased space at One Penn Plaza, the landlord made some contribution to the cost of tenant improvements, although not necessarily the cost of a full build-out. (Tr. 3/19/97 at 121–122). As part of Ms. Locatell's methodology to compute Mid–City's actual damages, she assumed, based upon the P.S.I. lease, annual increases of 3½ percent in real estate taxes, operating expenses and ERIF. (Tr. 9/11/97 at 716). The P.S.I. lease provides for ERIF in the base amount of $3,000. (Tr. 9/11/97 at 709).

Ms. Locatell compared the net present value of the income stream provided by the Lease with the net present value of the fair market rent for the premises to compute the amount of Mid–City's actual damages. (Tr. 9/11/97 at 711). Using a discount rate of 12 percent, she arrived at the net present value of the income stream under the Lease of $5.6 million. (Tr. 9/11/97 at 720–721). She testified that she used a discount rate of 12 percent because the discount rate as of May 1996 for a midtown office ranged from 9 to 18 percent, with the reported average being 11.9 percent. (Tr. 5/14/97 at 52). Ms. Locatell computed the net present value of the fair market for the premises to be $3 million by totaling the cost of "breaking up" the 46th floor, determining the net present value of the space occupied by P.S.I. pursuant to the terms of the P.S.I. lease[5], including real estate tax and operating expense escalations based upon historical data, determining the net present value of the remaining 17,309 square feet on the 46th floor, based upon market assumptions as to when the space will lease, at what rent it will lease, the terms

of tenant installation and leasing commissions, as well as real estate tax and operating expense escalations and ERIF charges, and the net present value of the storage space on the 6th floor. (Tr. 9/11/97 at 711–714). With respect to the remainder of the 46th floor, Ms. Locatell testified that she assumed that Mid–City would begin to collect income as of April 1, 1998, with an initial base rent of $31 per square foot and a step-up in the sixth year of the lease at an amount equal to "20 percent of the $30 per square foot", operating expenses and real estate tax escalation with annual increases of 3½ percent, and ERIF charges at $3 per square foot, increasing at 3½ percent annually. (Tr. 9/11/97 at 715–716). Ms. Locatell further assumed tenant improvements at $35 a square foot based upon the P.S.I. lease, and a full broker's leasing commission equal to 32 percent of the first year's rent. (Tr. 9/11/97 at 715–718). However, she did not make separate assumptions regarding the total amount of time for free rent and building out Andover's space, rather, she utilized one, two and three year assumptions for combined downtime, free rent and construction. (Tr. 9/11/97 at 717).

Using her methodology, Mid–City's actual damages were $2.6 million, the difference between the discounted net present value of the income stream under the Lease at a discount rate of 12 percent ($5.6 million) and the discounted net present value of the fair market rent for the premises using a discount rate of 12 percent ($3 million). (Tr. 9/11/97 at 720–721). Using a 9 percent discount factor, the correct discount rate according to Andover's expert, she testified that Mid–City's damages remained at $2.6 million although the net present value of Andover's rental stream under the Lease and the net present value of the fair market rent for the premises each increased by $500,000. (Tr. 5/19/97 at 204–205; Tr. 9/11/97 at 720–721).

---

**4.** "Downtime" is the length of time it would take a landlord to find a tenant, negotiate and document the lease and rent out space; "free rent" is what a landlord offers the tenant once the tenant is in occupancy. (Tr. 5/14/97 at 39)

**5.** Ms. Locatell testified that pursuant to the terms of the P.S.I. lease, Mid–City incurred a tenant

installation cost of $35 a square foot or approximately $559,000, approximately $175,000 in capital costs to construct a common corridor on the 46th floor for multi-tenant occupancy, approximately $230,000 in commissions paid to an outside broker, and free rent of approximately 3½ months or $139,000. (Tr. 9/11/97 at 710–711).

Andover's expert witness, Arthur Nelkin, a real estate advisor and investor, agreed with Ms. Locatell's overall approach, but, as just mentioned, testified that the correct discount rate to be used is 9 percent (Tr. 5/19/97 at 204–205). Mr. Nelkin testified that had he been advised in June, 1996 that the 46th floor would become vacant shortly, there was an 80 percent chance that he could have leased the 46th floor by the end of 1996. (Tr. 5/19/97 at 195). To that, Mr. Nelkin testified that an additional 6 months for construction and free rent would be added for "a 10 month total, slightly less." (Tr. 5/19/97 at 195, 313). Mr. Nelkin further testified that had he leased the 46th floor by the end of 1996, the rental would have been $29 to start, increasing in the later years of a new lease to an average of $31.50 (Tr. 5/19/97 at 195–196), and that he believed that the market average rent in May, 1997 on that space would be $34 a foot. (Tr. 5/19/97 at 195–196). Therefore, based upon Mr. Nelkin's testimony, it would appear that Mid–City could have started to receive rental income in connection with Andover's premises by June 1, 1997, or even sooner had Mid–City decided to modify the Lease to permit Andover to occupy less space at a reduced rent as hoped for by Andover.[6]

Andover argues that I should disregard the testimony of *both* experts as contrary to the *Farmers Trust* formula, which compares the discounted rental value—and not discounted actual income—with the discounted rent reserved. *Farmers Trust*, 299 U.S. at 443, 57 S.Ct. 292. In line with this argument, Andover contends that "downtime" is irrelevant in determining a landlord's damages under *Farmers Trust*. In response, Mid–City contends that "downtime" necessarily affects the fair market value of the property because the landlord does not receive any income from the property while it is relet. Both parties rely upon *In re Ames Department Stores, Inc.*, 209 B.R. 627 (S.D.N.Y.1997) in support of their respective positions.

In *Ames Department Stores*, a case brought under Florida law, the debtor rejected a lease with 13 years yet to run for 60,200 square feet of commercial retail space in a shopping center. The lease required the debtor to pay a minimum annual rent of $2.15 per square foot. About a year and a half later, the landlord leased 51,500 square feet to a tenant for a 90–day term at $9,000. Subsequent to the expiration of the 90 day lease, the landlord leased another 25,600 square feet to a second tenant for a term of 5 years at an annual rent of $75,000. Two and one-half years after the rejection, the landlord leased 34,600 square feet to a third tenant for 7 years at an annual rent of $93,-770.04 for the first five years and $101,402.04 for the last 2 years. The landlord incurred renovation costs of approximately $104,000 to accommodate one of the tenants. The total amount of annual rent that the landlord received from the replacement tenants, once all were installed at the premises, exceeded the amount of rent due annually under the original lease. The landlord estimated that the current market rent of the premises was no less than $3 per square foot. Following rejection of the lease, the landlord filed a rejection claim seeking one year's rent. Thereafter, the landlord moved for summary judgment, arguing that, under state law, it was entitled to damages from the debtor's rejection of the lease. The debtor cross-moved for summary judgment disallowing the claim, responding that the landlord had not suffered any damages because the rental value of the premises exceeded the rent reserved under the lease. The debtor appealed the Bankruptcy Court's Memorandum Decision and Order granting summary judgment to the landlord and denying its cross-motion for summary judgment disallowing the claim. The District Court vacated the Memorandum Decision and Order and "remanded the action to the Bankruptcy Court for a trial on the issue of the landlord's damages and its efforts to mitigate damages as they may bear upon that determination."

---

**6.** Andover further argues that if Mid–City had agreed to accept Andover's post-petition proposal, Mid–City already would have been paid more than $300,000 in rent, without suffering any detrimental impact upon its ability to find a long-term replacement tenant. This argument, however, goes to the issue of whether Mid–City has a duty under New York law to mitigate its damages, which I will discuss later in this decision.

*Id.* In reaching its decision, the district court reasoned that the "rent received by the [landlord] from the New Leases permits the rational inference that the [landlord] could have rented the premises earlier at a rate less than the New Leases but higher than the reserved rent. On the other hand, the [landlord's] initial failure to re-let the Premises permits a competing rational inference that the fair market value of the remainder of the leases was less than the reserved rent, because the lessor, as a prudent business person, might not have let the premises remain vacant if he or she could have recouped the rent by a timely re-rental. Since either inference would be rational, summary judgment is inappropriate." *Id.* at 631. In a footnote the court remarked that it "rejects the landlord's argument that damages can or should be measured by the rents received or not received, in the period following rejection of a lease." *Id.* at 631, n. 6.

 Andover's argument that one looks at only rental value under *Farmers Trust* begs the question, for Andover ignores the testimony of both experts and assumes that the premises could be relet in the moment following rejection. Obviously, that cannot be what rental value means. This is not to suggest that the court must continually refine the damages based on what the future brings for the landlord, an approach which would stymie efforts to liquidate claims and, possibly, to reorganize. But some effort must be made to quantify, as of the moment of rejection, the value of returned premises to the landlord, a concept which necessarily includes the likely expenses that the landlord would incur to realize the value. Indeed, that seems to be what the *Farmers Trust* formula aims to do, taking into account the predicted future usability of the premises and probable future rent. *See Palmer v. Connecticut Ry. & Lighting Co.,* 311 U.S. 544, 559, 61 S.Ct. 379, 85 L.Ed. 336 (1941). ("Future rental value cannot be susceptible of precise proof. As it depends, so far as the amount of damages for breach of a lease is concerned, upon future profits, it partakes of the nature of loss of earning capacity or of credit. To require proof of rental value approaching mathematical certitude would bar a recovery for an actual injury suffered. All

that can be done is to place before the court such facts and circumstances as are available to enable an estimate to be made based upon judgment and not guesswork. Every anticipatory breach of an obligation, and every appraisal of damage involving the present value of property involves a prediction as to what will occur in the future. Present market value of property is but the resultant of the prediction of many minds as to the usability of property and probable financial returns from that use, projected into the future as far as reasonable, intelligent men can foresee the future."); *see also Kuehner v. Irving Trust Co.,* 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937). I agree that actual expenses ought not be the test, for the landlord may or may not have used reasonable judgment in incurring them. It is possible, for example, that in a market which seemed to have been rising the landlord may have refused tenancies which may have made the landlord whole, in favor of holding out for a tenant who would demand more concessions but would, in turn, agree to a higher rent than what the debtor was paying.

To compute the gross fair market value of the premises under a hypothetical new lease from the Rejection Date of the Lease until its expiration on April 30, 2004, Ms. Locatell utilized the actual base rent of $30 per square foot as well as additional rent step-ups to be paid under the terms of the P.S.I. lease. (Tr. 9/11/97 at 717). Because the projected fair market value of Andover's premises is to be determined as of the time of rejection of the Lease, Mid–City may not utilize in its calculation the actual rent to be received under the P.S.I. lease, which was executed in July, 1997. Therefore, I give greater weight to Mr. Nelkin's testimony that the fair market rent would have been $29 per square foot to start, with an average rental over the term of the lease of $31.50. (Tr. 5/19/97 at 195), which is precisely what Ms. Locatell had testified to prior to Mid–City's entry into the P.S.I. lease. (Tr. 9/11/97 at 717, 757).

 For the reasons discussed below, I also conclude that "downtime" should be included in the landlord's calculation of its

rejection claim. Both experts differ regarding the appropriate amount of downtime. Whereas Mr. Nelkin testified that there was an 80 percent chance that he could have leased the 46th floor within 4 months of rejection of the Lease, his confidence in his ability may not be truly representative of the market and is not without uncertainty. On the other hand, Ms. Locatell testified that she did not agree with the assumption that a tenant should have been found by January 1, 1997 based upon the "historical record" that the premises was not relet until at least 10 months after Andover's vacatur. (Tr. 9/11/97 at 741–743, 767). I do not agree that "20–20 hindsight" is the correct measure of downtime. Because the opinions of the experts appear to be at the opposite ends of the downtime spectrum, I find that the reasonable amount of downtime to be included in the computation of Mid–City's rejection claim is at the midway point of 7 months. With respect to the correct measure of time for free rent and construction, I will give greater weight to Mr. Nelkin's testimony that the combined time is 6 months. So it is to the expenses that we now proceed.

### b. Which expenses are properly a component of the claim

#### (i) Demolition cost

Article 15 of the Lease permits Mid–City, at its option, to alter, repair or make replacements in the premises as Mid–City, "in [its] sole judgement, considers advisable and necessary for the purpose of reletting the demised premises." Mid–City may include in its computation of damages the capital costs which it necessarily expended to obtain successor tenants, but not which represent long term capital improvements which yield a betterment to the leasehold. *See In re Handy Andy Home Improvement Centers, Inc.*, 1998 WL 603252, at *5, 1998 Bankr.LEXIS 1175 at *14 (Bankr.N.D.Ill. 1998); *accord In re Stewart's Properties, Inc.*, 41 B.R. 353, 356 (Bankr.D.Haw.1984); *Matter of Parkview–Gem, Inc.*, 465 F.Supp. 629 (W.D.Mo.1979); *see also C.D. Stimson Co. v. Porter*, 195 F.2d 410, 414 (10th Cir. 1952) (changes to the premises, such as dividing it into two rental units, installing two restrooms and other major alterations, are improvements of substantial and permanent character which redound to the landlord's benefit and enhance the premises' value.)

Mid–City contends that the tenant installation cost in connection with the P.S.I. lease was $35 a square foot and the total capital costs, including the tenant installation, leasing commissions, building a common corridor, and 3½ months of free rent, total approximately $1.1 million. (Tr. 9/11/97 at 710–711). Mid–City projects that an approximately equal sum will be incurred by Mid–City to relet the balance of the premises. (Mid–City Reply Memorandum, p. 10). Mid–City also acknowledged that the building will have the benefit of the corridor if the market is such that the space will be leased to multi-tenants. (Tr. 9/11/97 at 755). Andover argues that the costs of Mid–City's new tenant improvements were improperly and unreasonably inflated because Mid–City completely demolished the space, and, as a result, the difference between the tenant improvement costs that would have been incurred if Mid–City had not gutted the premises ($20–$25 per square foot) and the full cost of the installation now required as a result of the demolition ($35–$40 per square foot) should be waived. Once again, this argument ignores the testimony of Andover's own expert.

Mid–City unilaterally decided to demolish the 46th floor. (Tr. 3/19/97 at 96). According to testimony provided by Mid–City, it is common practice to demolish space which does not lend itself to reletting as currently configured. (Tr. 3/19/97 at 59). The testimony established that because Andover was in the garment business, its installation was not typical of other tenant installations in One Penn Plaza or fully functional for a different tenant. (Tr. 6/2/97 at 512–513, 516–517; Tr. 6/18/97 at 694). Mr. Nelkin, Andover's expert witness, agreed that there are certain circumstances when it would be appropriate for the landlord to gut the existing installation as part of its reletting efforts, (Tr. 5/19/97 at 288–289), and that it is easier for a landlord to lease vacant space compared to occupied space. (Tr. 5/19/97 at 292). However, he further testified that although there was a "possibility" that a tenant could have been found that wanted Andover's in-

stallations as is, it was more likely that Mid–City could have found a tenant who needed modest alterations, instead of completely gutted space. (Tr. 5/19/97 at 202–203).

Mr. Nelkin's opinion was based on the type of installation which Andover had. Approximately 25 percent of Andover's space on the 46th floor was renovated in 1995–1996. (Tr. 6/18/97 at 574). The renovation consisted of demolishing the space, removing existing walls, ceilings, lighting, and the existing supplementary air conditioning unit, and building new walls, ceilings, lights, a kitchen, a computer room with a special electric installation, conference room, and a new supplementary air conditioning unit. (Tr. 5/14/97 at 140; Tr. 6/2/97 at 511–512; Tr. 6/18/97 at 574). When the space was demolished after rejection of the Lease, the major components of the building remained, such as the supplementary air conditioning unit, the sprinkler system and the electrical system. (Tr. 6/18/97 at 581–582). Although Andover's original installation was 20 years old, approximately 50 to 70 percent of the space was renovated over the years, inclusive of the space renovated in 1995–1996. (Tr. 6/2/97 at 510–511). Andover provided testimony that the areas renovated in 1995–1996 were in good shape (Tr. 6/2/97 at 513) and none of the space was outdated in any way. (Tr. 6/2/97 at 514).

Mid–City's reletting efforts with respect to the 46th floor were geared primarily to finding a successor tenant for the entire floor (Tr. 3/19/97 at 81); it was prepared, however, to divide up the floor if a single tenant could not be found. (Tr. 3/19/97 at 111). Mr. North, Mid–City's witness, testified that it would cost substantially more to divide up a floor than to lease it to a single tenant, because of the need to create a public corridor with proper demising walls and shared facilities. (Tr. 3/19/97 at 111–112). He justified the length of time it took Mid–City to find an appropriate tenant on the then-current vacancy rate at One Penn Plaza, approximately 11 percent (Tr. 6/18/97 at 672), which was higher than the vacancy rates of the other buildings in midtown Manhattan, especially Two Penn Plaza. (Tr. 5/19/97 at 306–307).

Andover's experts testified that Andover's space was not relet as quickly as it could have been because of the insufficiency of Mid–City's and Helmsley–Spear's marketing efforts for the premises (Tr. 6/2/97 at 415–17) and "turmoil in the market" caused by "battles" at the top of Helmsley–Spear, the managing agent and a general partner of Mid–City. (Tr. 5/19/97 at 196–97; Tr. 9/11/97 at 779; Trial Exhibits EE – HH).[7]

7. In an attempt to bolster the testimony of its expert witnesses, Andover has also sought to admit into evidence as admissions against Helmsley–Spear's interest (Tr. 9/11/97 at 784–789), whose status as a partner in Mid–City is also disputed by the parties, allegations made by Peter L. Malkin in an unverified complaint filed in a state court action commenced in New York in June, 1997. (Tr. 9/11/97 at 784–92; Trial Exhibit XX). I admitted the Malkin complaint into evidence subject to Andover providing me with authority that the statements contained therein are admissions. I informed the parties that if I were to determine that the complaint should not be admitted, I would ignore it. (Tr. 9/11/97 at 789). Andover argues that the allegations in the Malkin complaint are highly probative with respect to the One Penn Plaza building and, therefore, may be admitted into evidence under Rule 801(d)(2)(D) of the Federal Rules of Evidence because they constitute admissions against interest by a party-opponent. In support of its contention, Andover relies upon *U.S. v. Saks*, 964 F.2d 1514, 1524 (5th Cir.1992) and *Guccione v. Hustler Magazine, Inc.*, 632 F.Supp. 313, 320 (S.D.N.Y.1986). In each of these cases, the litigants sought to admit into evidence the sworn deposition testimony of a party-opponent, unlike Andover, who sought to admit unsworn allegations made by Malkin. The problem is that the allegations in the Malkin complaint may not be proven at trial as the evidence unfolds. *See McCormick on Evidence* § 257 ch. 25 at 149–150 (4th ed.1992). Even if I were to find that the allegations in the Malkin complaint are admissions by a party-opponent under Rule 801, "an admission is subject to exclusion if its probative value is outweighed by its potential for unfair prejudice." McLaughlin, *Weinstein's Federal Evidence*, § 801.20[3] at 801–44 (2d ed.1998). As part of its case, Andover had elicited the testimony of two of its expert witnesses to prove Andover's contention that the vacancy rate at One Penn Plaza was comparatively higher than other office buildings in mid-town Manhattan due to Helmsley–Spear's mismanagement and incompetency in its marketing and leasing efforts. Because I believe that the potential for unfair prejudice to Mid–City from admitting the allegations into evidence outweighs their probative value, I will exclude the proposed exhibit.

Because of: (i) the difficulty of locating a tenant to relet an entire floor, especially in a building which has a higher vacancy rate than other buildings in midtown Manhattan; (ii) both experts' opinions that gutting of floors is an appropriate marketing device where it may be difficult to visualize space reconfigured from what the previous tenant used it for; (iii) the twenty-year age of much of Andover's installation; and (iv) the possibility that multiple tenants would have to be found for the space, I find that Mid–City acted reasonably when it gutted the 46th floor and I will permit Mid–City to include the cost of the tenant improvements at $35 per square foot. However, because the construction of the common corridor is an improvement of substantial and permanent character which benefits Mid–City and enhances the value of the premises by permitting Mid–City to relet the premises to multiple tenants, I will not permit Mid–City to include in its rejection claim the cost of constructing the corridor.

### (ii) ERIF, real estate tax escalations and operating expenses

Mid–City's calculation of reserved rent is said by Andover to be overstated because it improperly includes claims totaling $330,-381.63 for post-rejection ERIF charges and escalations in real estate tax and operating expenses, which are neither related to the value of the Lease or the underlying building nor payable in fixed, regular or periodic charges.

Section 1.01 of the Lease provides that "[a]ll sums other than fixed annual rent payable by Tenant hereunder shall be deemed additional rent. . . ." ERIF is defined in the Lease as a component of rent. (Tr. 5/19/97 at 221; Lease, § 27.04(a) and (b)).[8] Instead of having its usage measured by a direct meter, Andover agreed to pay the amount of ERIF to Mid–City to compensate Mid–City "for obtaining and making available to [Andover] the redistribution of electric current as

an additional service," through the presently installed electrical facilities, "[i]f and so long as [Mid–City] provides electricity to the demised premises on a rent inclusion basis." (Lease, § 27.04(b)).

The inclusion of a charge for the ERIF in Andover's Lease arises out of an old New York law which terminated the sub-metering of electricity by landlords in 1940 and required instead that landlords provide electricity to tenants and monitor their use, thereby making it unnecessary to maintain a direct meter for each tenant. (Tr. 5/19/97 at 206–207). Currently, tenants renting large spaces receive electricity through direct meters. (Tr. 5/19/97 at 207). However, when Andover negotiated its lease with Mid–City, electricity was still distributed according to an ERIF. (Tr. 5/19/97 at 207). Pursuant to the Lease, the amount of the ERIF charge is fixed at $3 per rentable square foot, payable in equal monthly installments. (Lease, § 27.04(b)). The amount of the ERIF, however, is subject to adjustment depending on any increases in energy costs, reclassification of service or imposition of taxes on Mid–City's purchases, and these adjustments, either increases or decreases, are passed along to all tenants of the building, including Andover. *Id.* Under no circumstance would Andover ever pay less than $3 per rentable square foot. *Id.* And if Andover were required to obtain electricity usage on its own, the ERIF charge would be eliminated. (Lease, § 27.04(c)). Mr. Grace, one of Andover's experts, testified that a landlord does not continue to incur charges in connection with electrical usage in a space once the tenant vacates and, therefore, does not have any electricity expense against which to offset the ERIF charge. (Tr. 6/2/97 at 422–23). According to Mid–City's expert, Sharon Locatell, the ERIF charge "is rent for delivery of the electricity. It's payable whether the tenant uses the electricity or not." (Tr. 5/14/97 at 67).

---

**8.** Article 27, section 27.04(b) of the Lease defines the "Electricity Rent Inclusion Factor" as "the amount determined by applying the estimated connected electrical load of tenant, which shall be deemed to be the demand (KW), and the hours of use thereof, which shall be deemed to be the energy (KWH), as determined by the electri-

cal consultant as hereinafter provided, to the rate charged for such load an energy usage in the SC–4, Rate 1 Classification in effect on May 1, 1994 (and not the time-of-day rate schedule, if any), as increased or decreased by all electricity cost changes of Landlord since May 1, 1994."

The courts have grappled for a long time with the question of what expenses other than "pure rent" constitute "reserved rent" under a lease. In *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 455, 57 S.Ct. 298, 81 L.Ed. 340 (1937), the Supreme Court commented that the test to determine the components of "reserved rent" include items having a relationship to the value of the property and the value of the lease. However, in more recent years, three tests have evolved to determine whether a certain charge ought to be included as rent. In the first test, a charge in a lease is part of the rent if it is (i) expressly labeled as "rent" in the lease, and (ii) payable in fixed, regular or periodic amount. *In re Conston Corp.*, 130 B.R. 449, 455 (Bankr. E.D.Pa.1991). In the second test, the court expanded the first test by including as a third factor whether the questionable charge relates directly to or increases the value of the property. *In re Farley*, 146 B.R. 739, 746 (Bankr.N.D.Ill.1992). A later court which expressly rejected the *Conston* test but adopted the *Farley* test, declined to include the requirement that the rent be payable in fixed, regular periods. *In re Rose's Stores, Inc.*, 179 B.R. 789, 790 (Bankr. E.D.N.C.1995).

The third test to evolve was articulated by the court in *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (9th Cir. BAP 1995). Under this test, an expense found in a lease may be properly considered part of the "rent reserved" under the lease if:

1) the charge is: (a) designated as "rent" or "additional rent" in the lease, or (b) provided as the tenant's obligation in the lease;

2) the charge is related to the value of the property or the lease thereon; and

3) the charge is properly classifiable as rent because it is a fixed, regular or periodic charge.

*Id.* at 99.

Mid–City argues that under any of the three tests, *Farley, Conston* or *McSheridan,* Mid–City's methodology for computing its lease rejection damage claim pursuant to section 502(b)(6) of the Bankruptcy Code properly takes into consideration the ERIF, and the real estate and operating escalation charges included in the Lease. To determine whether these charges are part of the rent reserved under the Lease, I am required to look beyond the mere labeling of the charge in the Lease as a form of rent. *McSheridan,* 184 B.R. at 99 (*citing Oldden v. Tonto Realty Corp.,* 143 F.2d 916, 920 (2d Cir.1944)). To make this determination, I will apply the *McSheridan* test which, because it includes the factors found in the *Conston* and *Farley* tests, will result in a more comprehensive analysis.

The first and third factors of the *McSheridan* test are plainly met. The ERIF charge is included in the Lease on a "rent inclusion basis" to be paid by Andover in equal fixed, regular monthly payments of $3 per rentable square foot, subject to adjustment based upon Andover's electrical usage. (Tr. 5/19/97 at 206–207; Lease, § 27.04(a) and (b)). Thus, the issue then becomes whether the ERIF charge is related to the value of the property or the lease thereon.

Although one case does suggest that electrical usage can be considered as part of the "rent reserved" in limited circumstances, *Rose's Stores,* 179 B.R. at 791 (a "mandatory minimum [utility] charge required to preserve the value of the property, if properly documented, would be includable in the rent reserved."), there is no evidence to suggest that this is the case here. Unlike insurance or real estate taxes which courts have determined to constitute "rent reserved," finding that they have a relationship to the value of the property and the value of the lease thereon; *see, e.g., Heck's, Inc. v. Cowron & Co. (In re Heck's, Inc.),* 123 B.R. 544, 546 (Bankr. S.D.W.Va.1991) and *Rose's Stores,* 179 B.R. at 791, the amount of the ERIF charge to be paid by Andover is only related to its electrical usage. But for Mid–City's legal obligation at the time it negotiated the Lease to provide electricity to Andover through this method, Andover would have obtained electricity from Con Edison directly and been linked to a direct meter to monitor its usage. Therefore, once Andover vacated the premises, it would no longer incur any electrical charges. Similarly, the next tenant or tenants occupying Andover's former space would have the benefit of a direct electrical

meter or a different ERIF charge based upon usage. Thus, Mid–City's attempt to include the ERIF charge as a component of the "rent reserved" is not factually supported.

My conclusion is not changed by *Empire State Bldg. v. State Dep't of Taxation & Finance,* 81 N.Y.2d 1002, 599 N.Y.S.2d 536, 615 N.E.2d 1020 (1993). In *Empire State Bldg.,* the court considered the issue of whether a landlord was engaged in the sale of electricity to its tenants by virtue of using an ERIF mechanism in its leases with tenants and thus was liable for sales tax. The New York Court of Appeals found that the landlord was not liable for sales tax because the electricity expense was incident to the rent (which is specifically defined in the New York City Administrative Code for business and professional tenants for the purpose of determining what component of rent is taxable) and not a separate transaction for utilities.

Through the ERIF mechanism, Andover was required to pay a minimum base amount for electric usage which is capable of being adjusted upward if it uses more electricity than what was originally forecast. This seems no different than if Andover had gone into the marketplace itself, negotiated an electrical usage contract on its own with a utility and paid a base monthly price subject to increase if it used more power. Plainly, Andover's electrical usage has nothing to do with the value of the property or the Lease. Therefore, notwithstanding ERIF's denomination as rent in the Lease, I find that the ERIF charge does not constitute "rent reserved" to be included in Mid–City's rejection claim.

■ With respect to Mid–City's inclusion of escalation charges for real estate taxes, Article 45 of the Lease provides that And-

over "shall pay to Landlord, as additional rent, tax escalation and operating expense escalation." [9] As previously stated, many courts have held that real estate tax charges are properly included in the "rent reserved" because their payment goes to the maintenance of the value of the property or lease. *See, e.g. Heck's,* 123 B.R. at 546 and *Rose's Stores,* 179 B.R. at 791. If they are not paid, then the landlord's equity in the property diminishes. As a consequence, these charges are properly included in Mid–City's claim.

■ As for the operating expenses, Article 45(ix) of the Lease denominated as additional rent operating services which Mid–City provided to Andover as a tenant in its building, such as window-washing, elevator maintenance, cleaning services, and replacement and improvements in the building infrastructure.[10] Although Mr. Nelkin, one of Andover's expert witnesses, testified that Andover's vacancy resulted in a $1.50 square foot savings to Mid–City with respect to cleaning expenses attributable (Tr. 5/19/97 at 209), Mid–City contends that Andover's vacancy "possibly" may have resulted in a savings of cleaning supplies (Tr. 6/18/97 at 663), but not a reduction in the cleaning staff. (Tr. 6/18/97 at 663; Tr. 9/11/97 at 734). Again, as with the ERIF, simply because a lease denominates an item as rent does not make it necessarily so. *McSheridan,* 184 B.R. at 99 n. 7 (court's independent determination of what constitutes "rent reserved" eliminates the possibility that a lease would be drafted designating all charges as rent).

Under the first prong of the *McSheridan* analysis, the operating expense escalation charges are denominated as "additional rent" and are Andover's obligations under the Lease. In addition, they are classified in the Lease as fixed, regular charges, meeting the second prong of the formulation. But here,

---

9. Article 45, section vi of the Lease provides that real estate taxes "shall mean the total of all taxes and special or other assessments levied, assessed or imposed at any time by any governmental authority upon or against the building project, and also any tax or assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income of rents from said building project to the extent that same shall be in lieu or a portion of

any of the aforesaid taxes or assessments, or additions or increases thereof, upon or against said building project."

10. Article 45, section ix of the Lease states " 'expenses' shall mean the total of all the costs and expenses incurred or borne by the Landlord with respect to the operation and maintenance of the building project and the services provided tenants therein."

again, we must pause to consider whether the operating expense escalation charges are related to the value of the property. The operating expense escalation charges are for the upkeep and maintenance of One Penn Plaza akin to a common area maintenance expense, and thus, I believe them to be related to the value of the property. *See Heck's*, 123 B.R. at 546. Therefore, I find that Mid–City may properly include the operating expense escalation charges in its damage claim.

### c. Whether Mid–City's Alleged Failure to Mitigate Precludes its Recovery

As previously mentioned, Andover argues that Mid–City is not entitled to actual damages under New York law because it failed to exercise its duty to mitigate those damages and by gutting the premises, actually exacerbated its damages. Mid–City argues in response that New York law does not impose a duty on a commercial landlord to mitigate its damages after a tenant breaches its lease and that, even if such a duty were to exist, Mid–City made a diligent and reasonable effort to find a successor tenant.

Historically, under New York law, a commercial landlord faced with a defaulting tenant had no duty to mitigate his damages, but was permitted to stand by and watch them accrue as the property lay vacant. *See Rubin v. Dondysh*, 146 Misc.2d 37, 549 N.Y.S.2d 579, 580–81 (Civ.Ct.1989), *rev'd*, 153 Misc.2d 657, 588 N.Y.S.2d 504 (1991). Observing that more than a dozen other states had rejected the traditional rule in favor of a duty to mitigate, *see* 21 *A.L.R.*3d 534 § 7, some lower courts began to attribute to a landlord the same duty to mitigate imposed on other contracting parties. *Grays v. Brooks*, 148 Misc.2d 646, 561 N.Y.S.2d 515, 516 (Civ.Ct. Queens Co.1990) (under the emerging rule, which the court adopts prior to the Appellate Division's reversal of the *Rubin* case, the trend is to place an affirmative duty on the landlord to mitigate his loss in both residential and commercial leases); *437 Madison Ave. Assocs. v. A.T. Kearney, Inc.*, 120 Misc.2d 944, 466 N.Y.S.2d 931, 933 (Civ.Ct.N.Y.Co.1983) (extending duty to mitigate damages to [commercial] landlord-tenant relationship), *aff'd*, 127 Misc.2d 37, 488

N.Y.S.2d 950 (App.Div.1985). Notwithstanding these cases, other courts held fast to the traditional rule. *See Sage Realty Corp. v. Kenbee Management–New York Inc.*, 182 A.D.2d 480, 582 N.Y.S.2d 182 (1st Dept.1992) ("[t]his court has repeatedly held that 'in a commercial lease the lessor is not under a duty to mitigate damages' ") (quoting *Mitchell & Titus Assocs. v. Mesh Realty Corp.*, 160 A.D.2d 465, 554 N.Y.S.2d 136 (1st Dept. 1990)); *Rubin*, 588 N.Y.S.2d at 505 ("although there may be a duty upon residential landlords to attempt to rerent and thereby mitigate damages, no such requirement exists in the context of commercial leases"). And, as late as 1993, although the Southern District decried the lack of an authoritative Court of Appeals decision on the issue, it was nonetheless still inclined to find that the duty to mitigate had not yet been imposed on commercial landlords by New York law. *Kahn v. Taco Bell Corp.*, No. 92 Civ. 6304(JSM), 1993 WL 313055 at *4 (S.D.N.Y. Aug. 10, 1993).

The District Court's plea for guidance was granted in 1995 by the New York Court of Appeals. *Holy Properties Ltd. v. Kenneth Cole Productions, Inc.*, 87 N.Y.2d 130, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995); *see also, American Transtech, Inc. v. U.S. Trust Corp.*, 933 F.Supp. 1193, 1199 (S.D.N.Y.1996). Citing the fact that in real property law established precedents are not lightly to be set aside, the court confirmed that "once the lease is executed, the lessee's obligation to pay rent is fixed ... and the landlord is under no obligation or duty to the tenant to relet or attempt to relet abandoned premises in order to minimize damages." *Holy Properties*, 637 N.Y.S.2d at 966, 661 N.E.2d 694. The Court of Appeals explained that when a lease is terminated prior to its expiry a landlord has three options: (i) it can do nothing and collect the full rent due under the lease, (ii) it can accept the tenant's surrender, reenter the premises and relet them for its own account, thereby releasing the tenant from further liability, or (iii) it could notify the tenant that it was entering and reletting the premises for the tenant's benefit. *Id.*

██ Relying on *Holy Properties*, Andover argues that because Mid–City reen-

tered, demolished and relet the premises to P.S.I., a new lessee, for Mid–City's own benefit, it elected to mitigate its damages, which efforts, as a matter of law, were insufficient and by so doing effected a surrender and acceptance of the premises, releasing Andover's bankruptcy estate from all liability. Andover's reliance is misplaced. If Andover's reading were correct, then the *Holy Properties* decision is essentially an invitation to landlords like Mid–City to leave the premises as they were on the day a tenant leaves after rejecting the lease and file a claim at the statutory maximum without trying to find a new tenant. The court in *Holy Properties* envisioned that a departing tenant would be relieved of further liability once the landlord actually had relet the premises to a new tenant. The court did not tell tenants that damages would be cut off as soon as a landlord reenters its premises and begins to seek a replacement tenant. The tenant by its breach of the lease has disrupted the landlord's business and forced it into incurring unanticipated damages; there is no authority in the *Holy Properties* decision cutting off the landlord's recovery for those damages at such an early date as Andover seeks. Moreover, there is no evidence in the record that the parties intended to effect a surrender and acceptance of the Lease. To accept Andover's argument would also be inconsistent with the plain meaning of section 365(g)(1) of the Bankruptcy Code, which states that rejection of an unexpired, unassumed lease constitutes a breach of the lease. Application of the doctrine of surrender and acceptance would have the effect of allowing state law to supersede bankruptcy law, thereby violating the Supremacy Clause. *See In re McLean Enterprises, Inc.,* 105 B.R. 928, 933 (Bankr.W.D.Mo.1989)(court determined that application of state doctrine of surrender would be inconsistent with section 365(g)(1) of Bankruptcy Code where parties intended to reject lease.)

Andover further argues, without any supporting authority, that Mid–City is not entitled to file a claim for damages because it commenced efforts to find a new tenant for the premises. Andover relies on New York state court cases for the proposition that once the landlord accepts surrender of the premises, the landlord/tenant relationship terminates and the tenant has no further payment obligations. *See Gotlieb v. Taco Bell Corp.,* 871 F.Supp. 147 (E.D.N.Y.1994); *Centurian Dev. Ltd. v. Kenford Co.,* 60 A.D.2d 96, 400 N.Y.S.2d 263, 264 (1977). While this is true enough in the non-bankruptcy context, bankruptcy changes the equation because where the debtor/tenant rejects a lease, the landlord has no other choice but to accept the return of the premises. *See* 11 U.S.C. § 365(d)(4); *In re Iron–Oak Supply Corp.,* 169 B.R. 414, 418 (Bankr. E.D.Cal.1994) (lessor is implicitly stripped of power to reject surrender). Once the premises are returned to the landlord, albeit many times involuntarily, the landlord, faced with the economic realities of the marketplace and the business necessities of having an income stream to operate the building, will seek to relet the premises. To then argue, as Andover has, that by so doing, Mid–City has relinquished its lease rejection damage claim is unfounded and contrary to the purposes of the Bankruptcy Code.

■ Despite the holding in *Holy Properties* that a landlord of a New York commercial lease does not have a duty to the tenant to relet or attempt to relet an abandoned premises in order to minimize damages, Andover urges that the equitable principles under the former Bankruptcy Act, as expressed in *Overmyer* and the legislative history of section 502(b)(6), create a background upon which the Bankruptcy Code and section 502(b)(6) must be read. The argument continues that, in the bankruptcy arena, a landlord should be held to a duty to mitigate its damages to insure an equitable distribution to all unsecured creditors and prevent a windfall to the landlord. Andover's novel argument, however, is contrary to the state of the law in New York today, as harsh as this rule may be, that upon a commercial tenant's breach of a lease and failure to pay rent, the landlord has no duty to mitigate its damages. *See Holy Properties,* 87 N.Y.2d 130, 637 N.Y.S.2d 964, 661 N.E.2d 694; *see also In re Episode USA, Inc.,* 202 B.R. 691, 696 (Bankr.S.D.N.Y.1996) and *In re Ames Department Stores, Inc.,* 158 B.R. 35, 36 (Bankr.S.D.N.Y.1993) (two recent cases in

which the courts applied the holding of *Holy Properties* that a commercial landlord does not have a duty to mitigate damages upon the tenant's abandonment of the premises.) Moreover, the other creditors are already protected against unduly large claims by the statutory cap which the Bankruptcy Code places upon a landlord's claim. *See In re Q–Masters Inc.,* 135 B.R. 157, 159 (Bankr. S.D.Fla.1991); *In re The Monetary Group,* 91 B.R. 138, 142 (M.D.Fla.1988); *In re Communicall Central, Inc.,* 106 B.R. 540, 544 (Bankr.N.D.Ill.1989), quoting H.R.Rep. No. 595, 95th Cong., 1st. Sess. 63 (1978). Because Mid–City did not have a duty to mitigate its damages, I need not decide whether Mid–City's efforts to relet the premises were reasonable.

### d. How is section 502(b)(6) to be computed?

■ Having determined the amount of Mid–City's actual damages, I will now turn to whether the statutory limitation on the amount of damages allowable for termination of a lease under section 502(b)(6) is 15 percent of the rent remaining under the Lease or 15 percent of the time remaining under the Lease, an issue with which the courts have grappled.

Section 502(b)(6) provides in pertinent part:

(b) the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which the lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due such under lease, without acceleration, on the earlier of such date.

11 U.S.C. § 502(b)(6).

As a debtor-in-possession, Andover has "all the rights ... and shall perform all the functions and duties" of a trustee. 11 U.S.C. § 1107(a). Among those rights is the ability, subject to the court's approval, to assume or reject any unexpired lease. 11 U.S.C. § 365(a). When, as Andover did here, a debtor rejects an unexpired lease, the breach is deemed to occur at the time the bankruptcy petition was filed, 11 U.S.C. § 365(g)(1), and the result of the breach is to give the landlord a general unsecured claim for damages caused by that rejection. 11 U.S.C. § 502(g). *In re Financial News Network, Inc.,* 149 B.R. 348, 350 (Bankr.S.D.N.Y.1993).

■ A landlord can claim any and all unpaid amounts due it under the lease as of the petition date. 4 L. King et al., *Collier on Bankruptcy,* ¶ 502.03[7][e] at p. 502–47 (15th ed. rev.1998). However, because commercial leases are typically of long-term duration, which could lead to an astronomical calculation of damages engendered by a lease's premature termination, Congress capped the maximum amount that a landlord can claim as damages caused by a debtor's rejection of a lease by means of section 502(b)(6). This provision limits a landlord's claim for damages to the rent reserved under the lease for one year, without acceleration, or 15 percent of the remaining term of the lease for a total period not to exceed three years, whichever amount is greater. *See In re Ames Department Stores, Inc.,* 209 B.R. 627, 630 (S.D.N.Y.1997). "The cap is designed to prevent a landlord's single unsecured claim—which, depending on the length of the lease, may be enormous—to elbow aside the other unsecured creditors." *Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.),* 78 F.3d 18, 26 (2d Cir.1996); *see Episode USA,* 202 B.R. at 693. As the legislative history to this section states, "the limitation on allowable claims was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove.... Second, ... the lessor retains all the risk and bene-

fits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor." S.Rep. No. 95–989, 95th Cong., 2d Sess. 63, 64 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5849; *see Kuehner v. Irving Trust Co.*, 299 U.S. 445, 455, 57 S.Ct. 298, 81 L.Ed. 340 (1937)(a sufficient ground for limiting a landlord's claim is that, unlike other unsecured creditors, a landlord gets back its property). The legislative history suggests that the section 502(b)(6) cap is akin to a liquidated damages provision, intended to give a fair remedy to both the debtor and the landlord, taking into account the fact that the landlord retains the property at the end of the lease while ensuring that the landlord does not get the lion's share of the estate to the detriments of the estate's creditors. *See id.; Leslie Fay Co. Inc. v. Corporate Property Assocs. 3 (In re Leslie Fay Co., Inc.)*, 166 B.R. 802, 808 (Bankr.S.D.N.Y.1994).

Courts applying section 502(b)(6) have adopted one of two positions in calculating the amount of damages a landlord may receive when a debtor tenant rejects a lease. Some hold that the reference to "15 percent" corresponds to either rent accruing for 15 percent of the remaining time under the lease, others, to 15 percent of the total rent remaining under the lease. The second of these views is the majority one. *See, e.g. Financial News Network*, 149 B.R. at 351; *In re Today's Woman of Florida, Inc.*, 195 B.R. 506 (Bankr.M.D.Fla.1996); *In re Gantos*, 176 B.R. 793, 796 (Bankr.W.D.Mich. 1995); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 232 (Bankr.D.N.D.1992); *Communicall Central*, 106 B.R. at 544; *McLean Enterprises*, 105 B.R. at 936–37. This view is also supported by respected treatises. *See, e.g.*, 4 L. King et al., *Collier on Bankruptcy*, ¶ 502.03[7][c] at p. 502–46 to 47(15th ed. rev.1998); *Norton Bankruptcy Law and Practice* 2d § 41.24 (1997). Courts following this approach agree that section 502(b)(6) does not provide a formula for calculating damages, but merely provides a cap. *See Financial News Network*, 149 B.R. at 352; *Gantos*, 176 B.R. at 794. As in the present case, the debtors in *Gantos* argued that because the rent provided within the lease increased throughout the lease term, a damage award which calculated 15 percent of the aggregate rent reserved would exceed the amount calculated according to the rent reserved for 15 percent of the remaining term. *Gantos*, 176 B.R. at 795. However, the *Gantos* court rejected the debtors' argument as well as the debtors' assertion that the landlord was attempting to gain an increased damage award. Instead the court subscribed to the majority view, holding it was reasonable for the landlord to receive damages for rent which the parties had bargained for in the lease. *Id.* at 796. In addition, the court believed that calculating damages in this way would preserve Congress' intent to protect other general creditors from excessively worse claims of landlords, because allowing landlords to collect damages based on 15 percent of the aggregate rent in the court's opinion, "will more accurately compensate them for their loss while the 15 percent limitation on the rent recoverable will concomitantly ensure that other general creditors will have an opportunity to recover from the estate." *Id.* at 795. Lastly, the *Gantos* court recognized that the statute is not a "model of clarity," but held that its reasoning was the most "natural" reading of the language of the statute. *Id.* at 795. *See also, McLean Enterprises*, 105 B.R. 928; *Communicall Central*, 106 B.R. 540; *Q–Masters*, 135 B.R. 157; *Financial News Network*, 149 B.R. 348.

Courts hewing to the majority view hold landlords should not be "deprived of their statutory rights because debtors might not do what Congress said they must do— 'timely perform all the obligations ... under any unexpired lease of nonresidential real property, until such lease is assumed or rejected.'" *Financial News Network*, 149 B.R. at 352; 11 U.S.C. § 365(d)(3). Courts in the majority posit that Congress intended to provide landlords with both actual past damages as well as limited future damages, hence the calculation of 15 percent of the reserved rent remaining under the lease. *In re Vause*, 886 F.2d 794, 801–802 (6th Cir.1989).

A minority of courts defend the reasoning outlined in *In re Allegheny Int'l, Inc.*, 136 B.R. 396 (Bankr.W.D.Pa.1991) *aff'd* 145 B.R.

823 (W.D.Pa.1992) which bases damages on 15 percent of the total amount of time remaining as opposed to the amount of rent reserved under the lease. In affirming the decision of the bankruptcy court, the district court in *Allegheny* reasoned that damages ought to be measured according to the total amount of time remaining under the lease because the statute references time periods when speaking about the amount of rent due once the lease has been surrendered. *Id.* at 828. "Specifically, the statute provides that claims cannot exceed the greater of *one year*, or 15 percent, not to exceed *three years*, of the remaining term, following the earlier of the *date* of the filing of the petition and the date surrendered." *Id.* The court concluded that from the legislative history [11] it appeared that Congress intended the phrase "remaining term" to measure damages as a function of time and not rent. *Id.; see also, In re Watkins Management Group, Inc.*, 120 B.R. 586, 587 (Bankr.S.D.Ala.1990). In addition, the bankruptcy court in Allegheny distinguished landlords from other creditors because a landlord is able to recover its property upon the filing of bankruptcy and may relet the space. *Allegheny*, 136 B.R. at 403. The bankruptcy court interpreted the statute to reflect Congress' awareness of this possibility by allowing a landlord a specific amount of time to relet the premises and, "restore itself to the same position as if the lease had not been terminated." *Id.* The court also cited to cases interpreting the previous law from which section 502(b)(6) evolved. These cases involved leases which included escalation clauses as in the present case, but calculated the damage cap based upon rent due the succeeding year rather than 15 percent of the rent due for the remainder of the lease. *Id.* at 402, (citing *In re Bonwit Lennon & Co.*, 36 F.Supp. 97, 99 (D.Md.1940)). Further, the bankruptcy court in *Allegheny* relied on the fact that the statute provides for damages to be calculated "without acceleration" in holding that the statute's language applies to the next suc-

ceeding term remaining in the lease. *Id.* Therefore, the bankruptcy court determined that Congress included this phrase in order to prevent all remaining rent from becoming due immediately upon the breach of the lease by the debtor tenant. *Id.*

It is "an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Mountain States Telephone & Telegraph Company v. Pueblo Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (quoting *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). To determine Congress' intent in drafting a statute, a court must first examine the language of the statute before turning to its legislative history. *U.S. v. Iron Mountain Mines, Inc.,* 812 F.Supp. 1528, 1557 (E.D.Cal.1992). If a statute is clear and unambiguous on its face, it should be enforced according to the terms outlined. *Patterson v. Shumate,* 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Therefore, the plain meaning of a statute should be followed unless it will produce an absurd result or a result at odds with the intent of Congress. *In re Episode USA, Inc.,* 202 B.R. 691, 695 (Bankr.S.D.N.Y.1996) (citing *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.' "). Where this is the case, Congress' intent, (which can be divined from legislative history) rather than a strict reading of the plain language of the statute, controls. *Iron Mountain Mines,* 812 F.Supp. at 1557. Ambiguity is evident when the statute may be understood by "reasonably well informed persons in two or more different senses." *Id.,* citing 2A Sutherland, *Statutory Construction,* § 45.02 at 5 (5th ed.1992). Additionally, if a statute may be interpreted differently by separate courts, it is evident that

---

11. "The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term ... after ... the date of surrender." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977); U.S.Code Cong. & Admin.News 1978, pp. 5787, 6309. The statute was later amended to increase the cap from 10 percent to 15 percent.

the statute is unclear and ambiguous. *Iron Mountain Mines,* 812 F.Supp. at 1557. Lastly, if a reading of the plain language of the statute reflects an unreasonable conclusion, an alternative reasonable conclusion should be adopted in its stead despite the statute's ambiguity or legislative history. *Id.* at 1558.

The majority and minority interpret the meaning of section 502(b)(6) and Congress' intent differently. They disagree as to whether the reference to "15 percent" refers to the time remaining under the lease or the rent reserved under the lease. Because the statute is unclear and ambiguous, I would turn to the statute's legislative history for guidance, were there any that answered the question whether the drafters intended the limitation to hinge on time or rent. Unfortunately, the legislative history is unilluminating and we are left with only judicial interpretation of what Congress must have intended. In that regard, because I find that it is the logically sounder approach, I concur with the majority view that in calculating damages pursuant to the section 502(b)(6) cap, a landlord must determine 15 percent of the total rents due under the lease, through the expiration date of the lease.

### B. The Remaining Claims

#### 1. Whether Mid–City Should Be Sanctioned

As mentioned, Mid–City denied the existence of any management agreement covering One Penn Plaza until, during trial, one of its own witnesses admitted that there was such an agreement, a copy of which was promptly thereafter delivered to Andover's counsel. Because of this conduct, Andover asks that I sanction Mid–City with disallowance of its administrative and unsecured claims, although Andover concedes that portions of these claims are valid.

Fed.R.Bankr.P. 7034 governs a party's request for production of documents and things. To be subject to discovery pursuant to Fed.R.Civ.P. 34, the item must be in the "possession," "custody," or "control" of a party. James Wm. Moore, *Moore's Federal Practice,* § 34.14[2][a] at 34–61 (3d ed.1998). The term "control" should be interpreted broadly. *Scott v. Arex, Inc.,* 124 F.R.D. 39, 41 (D.Conn.1989). A party is deemed to have control over documents that it has the, "right, authority, or ability to obtain upon demand." *Id.* at 41. However, legal limitations which may limit a party's ability to obtain a requested item do not necessarily preclude a determination that the party does in fact have possession, custody or control over the document or thing. *Id.* Yet a party may not be compelled to produce an item that does not exist because it is clearly not within the party's possession, custody or control. *Moore's Federal Practice,* § 34.14[2][a] at 34–62; *see S.E.C. v. Canadian Javelin Ltd.,* 64 F.R.D. 648, 651 (S.D.N.Y.1974) (holding that where transcripts of documents did not exist they therefore could not be produced). However, where it is beyond dispute that a defendant served with a discovery demand to produce documents had both access to, and the ability to obtain the documents for, its usual business, the defendant must produce the documents pursuant to the discovery demand. *Cooper Industries, Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919 (S.D.N.Y.1984). A defendant may not be permitted to present nothing more than conclusory statements to show that the requested documents are not in its custody or control. *Id.* (defendant can not hold crucial discovery documents by storing them with defendant's affiliate abroad.)

Failure to cooperate during discovery may subject a party to sanctions under Fed.R.Bankr.P. 7037. *In re Krontz,* 158 B.R. 684, 685 (Bankr.N.D.Ohio 1993). Sanctions pursuant to Fed.R.Civ.P. 37 may be applied "to penalize those whose conduct may be deemed to warrant such a sanction, (and) to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Fed.R.Bankr.P. 7037(c)(1) provides, in pertinent part, that:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to

use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. "For purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer or respond." Fed.R.Bankr.P. 7037(a)(3). "Rule 37(a), which applies to disclosure and discovery disputes, permits sanctions even if no court order compelling the disclosures or discovery has been entered, but the available sanctions are limited to expenses incurred in connection with making or resisting the motion to compel." *Moore's Federal Practice*, § 37.40 at 37–59.

Prior to and on the eve of the trial, Andover served subpoenas upon Mid–City for the production of the management agreement between Helmsley–Spear and Mid–City. (Tr. 3/19/97 at 70–71). The management agreement, however, was not produced until near the trial's completion. (Tr. 6/18/97 at 636). Andover contends that Mid–City denied the agreement's existence in response to each of the subpoenas. (Tr. 6/18/97 at 618–619). Mr. Grace testified that he was "startled when we were told that there was no management agreement." (Tr. 6/2/97 at 419). During the trial, Daniel North, a Vice–President of Helmsley–Spear and the general manager of the operation and leasing for the property, testified that he had "no knowledge of any" management agreement between Helmsley–Spear and Mid–City. (Tr. 3/19/97 at 72). However, Ronald Zeccardi, director of operations for One Penn Plaza, testifying as a witness for Mid–City, stated that he had found the management agreement in the desk of his predecessor and had given it to Mary Gartland several years ago. (Tr. 6/18/97 at 603–604).

Following Mr. Zeccardi's testimony, Andover made an oral application to this court for the imposition of sanctions on the grounds that Mid–City intentionally withheld the management agreement. In response to the issue raised at trial as to what the appropriate sanction might be under these circumstances, Andover, in its post-trial memo-randa, requested that I disallow Mid–City's administrative and unsecured claims in full, although Andover has admitted the validity of portions of these claims. Mid–City did not offer any explanation for the withholding of the management agreement and the inconsistent testimony of its witnesses, Mssrs. North and Zeccardi, except to argue that "two witnesses can differ in their knowledge as to whether an agreement exists." (Tr. 6/18/97 at 627). Mid–City argues that the non-production of the management agreement was inadvertent and unintentional. Despite Andover's contention otherwise, there is no evidence in the record demonstrating that Mid–City intentionally withheld its production until trial. (Tr. 6/18/97 at 632–640). Therefore, I find that Mid–City's repeated laxity in responding to Andover's document requests warrants the imposition of sanctions.

 "To the extent feasible, sanctions should be tailored to fit the circumstances in which the disobedience occurs." *Moore's Federal Practice*, § 37.41 at 37–61. Although Mid–City's failure to produce the management agreement is unjustified, Andover did not argue that Mid–City's failure to produce the document before trial prevented Andover in any way from preparing for trial. Even after the management agreement had been produced during trial, Andover did not request additional time to review the document or to prepare its case. Thus, to disallow Mid–City's claims, as Andover had requested, is too severe a punishment in response to the nature of Mid–City's culpability and actions. However, Andover should be compensated for the added expense it likely incurred by repeatedly requesting the production of this document. Therefore, I direct Andover to submit within 30 days of the date of this Order, an appropriate affidavit of its counsel, with supporting documentation, detailing the added and reasonable attorneys' fees Andover incurred in its efforts to secure Mid–City's compliance with Andover's discovery requests for a copy of the management agreement. This leaves for discussion the validity of Andover's objections to Mid–City's administrative and unsecured claims.

## 2. Whether Mid–City's unsecured and administrative claims should be fully allowed?

In addition to Mid–City's rejection claim for damages sustained from rejection of the Lease, Mid–City also filed timely an administrative claim in the amount of $35,811.31, which arises out of 9 days' rent which Andover incurred as a holdover tenant until it vacated the premises, and an unsecured claim in the amount of $195,803.95 for prepetition rent arrears and charges for air conditioning, cleaning and other services provided by Mid–City. Andover disputes $58,377.72 of the unsecured claim and $7,160.63 of the administrative claim, conceding the validity of the balance of these claims.

### a. Mid–City's unsecured claim

Mid–City initially filed its unsecured claim (claim no. 6) on June 5, 1996 for rent arrears and charges for air-conditioning, cleaning and other services in the amount of $137,426.23 for the period July 7, 1995 through March 18, 1996. (Trial Exhibit 41). On February 14, 1997, subsequent to the August 19, 1996 deadline to file prepetition unsecured claims, Mid–City filed an amended claim (claim no. 310) for rent arrears and air conditioning, cleaning and other services charges in the amount of $195,803.95. (Trial Exhibit 42). Andover argues that claim no. 310 should be disallowed and expunged because it is a "thinly-disguised" attempt to assert new claims after the August 19th filing deadline. The amendment was filed 9 months after the original claim was filed and 6 months after the last day for creditors to file prepetition unsecured claims. The issue is whether the amendments constitute new claims or instead relate back to the originally-filed proofs of claim.

"It is well settled that the decision to permit an amendment of a proof of claim rests within the sound discretion of the bankruptcy judge." *Integrated Resources, Inc. v. Ameritrust Co. National Association (In re Integrated Resources, Inc.),* 157 B.R. 66, 69 (S.D.N.Y.1993) (citations omitted). As I have observed before "[a]lthough amendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely permitted, such amendments are not automatic but are allowed, 'where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim.'" (citations omitted) *In re Macmillan Inc.,* 186 B.R. 35, 49 (Bankr.S.D.N.Y.1995); *see also Drexel Burnham Lambert Group Inc.,* 151 B.R. 684, 694 (Bankr.S.D.N.Y.1993). Amendments are disallowed when their purpose is to create a new claim. *In re Houbigant, Inc.,* 188 B.R. 347, 357 (Bankr.S.D.N.Y. 1995); *In re W.T. Grant Co.,* 53 B.R. 417, 422 (Bankr.S.D.N.Y.1985).

In deciding whether or not to allow an amendment to a proof of claim the court must first determine whether there was a timely assertion of a similar claim evidencing an intention to hold the estate liable. If there was such an assertion, the court then balances the equities, looking to such factors as: (i) undue prejudice to the opposing party; (ii) bad faith or dilatory behavior on the part of the claimant; (iii) whether other creditors would receive a windfall where the amendment not allowed; (iv) whether other claimants might be harmed or prejudiced; and (v) the justification for the inability to file the amended claim at the time the original claim was filed. *Macmillan,* 186 B.R. at 49 (citing *Integrated Resources,* 157 B.R. at 70). If, however, a claim is "new" and therefore fails to relate back, it may be allowed if the failure to file was the result of excusable neglect. *Macmillan,* 186 B.R. at 49; *see also In re Alexander's Inc.,* 176 B.R. 715, 719 (Bankr. S.D.N.Y.1995). The burden is on the claimant to prove that it did not timely file its proof of claim because of excusable neglect. *Macmillan,* 186 B.R. at 49, citing *In re Nutri*Bevco, Inc.,* 117 B.R. 771, 786 (Bankr. S.D.N.Y.1990).

Here the original claim provided Andover with notice that Mid–City intended to hold the estate liable for rent arrears and charges for air conditioning, cleaning and other services provided to Andover in accordance with the Lease in connection with the

6th and 46th floors for the period July 7, 1995 through March 18, 1996. Thus, Andover was on notice that Mid–City sought to hold them liable pursuant to the terms of the Lease for rent, rubbish and operating expense escalations with respect to the 6th and 46th floors which it occupied during this period. The space on the 10th floor was not deleted from Andover's Lease until July 17, 1995. (Second Lease Modification Agreement). Mr. Golding testified that he inadvertently omitted these damages from the original claim. (Tr. 5/14/97 at 89). There is no evidence in the record that Mid–City acted in bad faith in connection with the amendment of its claim or that the inclusion of these additional charges caused undue prejudice to Andover. Moreover, because Andover's confirmed First Amended Plan of Reorganization provided for a 100 percent payout, including interest, to all creditors, there is no evidence that they might be harmed or prejudiced by the allowance of this portion of Mid–City's amended claim. Accordingly, I will allow that portion of the amendment which seeks additional damages in connection with the 6th and 46th floors during the period July 7, 1995 through March 18, 1996. Because it is apparent that Mid–City had filed its original claim to include prepetition damages in connection with the premises demised under Andover's Lease, and had inadvertently failed to include operating expense escalations for the 10th floor space, I will allow that portion of the amendment which seeks damages for the 10th floor operating expense escalation during the period July 7, 1995 through March 18, 1996. The amendment seeking $40,039.84 in damages in connection with the intermediate level space suffers a different fate, however. During the trial, Mr. Golding testified that Mid–City's dispute with Andover regarding the payment of this sum was resolved by May, 1995 (Tr. 6/18/97 at 611–614). Therefore, based upon Mid–City's own admission, I will disallow this portion of Mid–City's amended claim on this ground, and need not decide whether these damages relate back to Mid–City's initial claim or if they should be allowed under the theory of excusable neglect.

### b. Mid–City's administrative claim

Andover objects to Mid–City's administrative claim, as amended (Trial Exhibits 43, 44 and 45) on the grounds that the claim includes damages for rent and other charges in connection with nearly 6,900 square feet of the 46th floor which, as Andover has argued, it effectively deleted. Based upon my determination early on in this decision that Andover had not effectively deleted this portion of the 46th floor space from its Lease, I will deny Andover's objection to this claim and allow Mid–City's $35,811.31 administrative claim in full.

### CONCLUSION

Mid–City has no duty under its commercial lease with Andover to mitigate its damages. Andover's objection to Mid–City's inclusion of ERIF charges and operating expense escalation charges in its rejection claim is GRANTED; Andover's objection to the inclusion of real estate tax escalation charges is DENIED; Andover's objection to the inclusion of damages relating to the 6th floor storage space is DENIED; Andover's objection to the inclusion of damages relating to the 46th floor space is DENIED; Andover's objection to Mid–City's unsecured claim is GRANTED IN PART and DENIED IN PART; and Andover's objection to Mid–City's administrative claim is DENIED. Andover's request for sanctions is GRANTED to the extent set forth herein.

Andover and Mid–City are to agree on an amended calculation of the section 502(b)(6) damages and the unsecured claim incorporate them into an order allowing these claims in the amount consistent with this decision.

SETTLE ORDER.